GEORGE SCHMIDT *v.* JACOB BARKER.

In the absence of any special agreement or understanding between a banker and a depositor, where the deposit is an irregular one; when an open account is kept; where moneys are deposited in bank to be drawn out, not in the identical funds deposited; where moneys deposited are mingled with the cash assets of the bank, and used indifferently with his own; the relations between a bank and its depositors are well and definitely fixed by our own law and jurisprudence, and by that of other countries, in which business is transacted with such institutions.

Such deposits are not real deposits, but are loans for use to the banker. The money so deposited transfers the property to the loanee; and the relation between a bank and its customers, in regard to irregular deposits so made, is simply one of debtor and creditor.

Legal agreements having the effects of laws upon the parties, none but the parties can abrogate or modify them; and it is incumbent on courts to give legal effect to all such contracts, according to the true intent of all the parties.

This court has often held that it will not lend its aid to settle disputes relative to contracts reprobated by law. It will notice their illegality *ex officio,* and allow it, without any plea, at any stage of the proceedings. Parties cannot be heard who ask relief from a violation of law. The law leaves them where their conduct has placed them, and "*in pari causa melior est conditio possedentis.*"

Every condition of a thing impossible, or *contra bonos mores,* or prohibited by law, is null, and renders void the agreement which depends on it.

He who binds himself unwillingly, and under constraint, is not deemed, in the eye of the law, a participant in an illicit covenant.

If, from the plaintiff's own stating, the cause of action appears to arise from a transgression of a positive law of the country, the court will not lend their aid.

APPEAL from the Sixth District Court of New Orleans, *Leaumont,* J. *Durant & Hornor for plaintiff.*—1. A sum of money deposited with a banker is not a real deposit. L. C. 2904. The only real deposit. L. C. 2934.

2. Money thus deposited is "a loan for use" to the banker. See L. C. 2883, 2884; Story on Bailments, ¿ 64, p. 65; *Matthews, Finley & Co.* v. *Their Creditors,* 10 An. 342; *Sims* v. *Bean,* 10 An. 346; Grant on Banking, page 1.

3. Loan for use transfers the property to the loanee. Troplong, Dépot, ¿ 115, ¿ 116; Pothier, Contract de Bienf. p. 71; *Melville* v. *Dodge,* 6 Murray, Granger and Scott; See 60 Eng. Com. Law Rep. p. 455; *Poll* v. *Clegg,* 16 Exchequer, 323.

4. In such a case the banker must pay, under all circumstances. L. C. 2891 *et seq.*; Pothier, Contract de Bienf. p. 108, ¿ 50, chap. 4; Pothier on Obligations, No. 622, p. 337 of Evans' translation; 2 vol. ¿ 622 of the Paris edition, 1813. See also *U. S. Bank* v. *Bank of Georgia,* 10 Wheat. 346, *et seq.; Commercial Bank* v. *Hughes,* 17 Wend. p. 100.

*Jacob Barker pro se.*—Now into court comes Jacob Barker, appellant, representing to this honorable court that the court below erred in giving judgment against him in the above entitled suit, the claim being founded on illegal and worthless notes received under an express agreement to be returned in the same description of paper, which says: "Deposits in this bank are received only on condition that the amount is to be drawn in Confederate currency;" and further, the balance in the bank book, introduced by plaintiff, is stated to be Confederate notes. The banking currency of the city was exclusively of that character at the time. The said agreement was also introduced by plaintiff.

The Confederate notes were not demanded or refused; always held subject to order of plaintiff, and were filed in the above entitled cause with the answer.

Defendant insists that it was not competent for a military commander to change the obligation of contracts by any military order, however much they may have a right to interpret any contract brought before it for adjudication.

Defendant insists that the military orders relied on by the appellee do not apply to this case.

In a case of collections of seventy thousand dollars by the State Bank of Louisiana for a Tennessee bank, in which Mr. Barker was counsel for the Tennessee bank, tried before General Butler, he decided in favor of the State Bank of Louisiana, using the following language: "That he saw no propriety in interposing the authority of the United States between the bank who sent the Confederate notes to be circulated here and the bank who received them, and consequently permitted the latter to return them in kind."

In a case similar to this, a case in which Mr. Barker was interested, was brought before Judge Bell, of the provost court of the Department of the Gulf, in which he decided "that the military authority did not come here to annul contracts or to furnish parties with an excuse for violating faith."

Mr. Barker begs to refer to a case in Illinois, (see A. L. Freeman's reports, 32 Illinois, *Osgood* v. *McConnell*,) where the judges say, among other things: to permit such proof would be to alter, change or modify the agreement of the parties, which cannot be allowed.

Mr. Barker also begs leave to refer to the Digest of Opinions of the Judge Advocate General of the Army, p. 30, wherein it is stated, among other things, "that Confederate notes are illegal and disloyal publications, and as such are ordered to be destroyed wherever found; an application, therefore, on the part of a foreign resident, to restore a quantity of such notes to him as their former possessor, either in their original form or in Federal currency of an equal amount, cannot be entertained."

Mr. Barker begs leave further to refer this most honorable court to the opinion of Chancellor Kent, in the case of *Griswold* v. *Waddington*, in the Court of Errors of New York. See Johnson's Reports, vol. 16, p. 485, in which the Chancellor says:

"If, from the plaintiff's own stating, or otherwise, the cause of action appears to arise from a transgression of a positive law of the country, the court will not lend their aid."

"It would be difficult to state any principle of law more plainly founded in common sense and true policy, than that which declares, that a plaintiff must not appear, from his own showing, to have infringed the law of the land; and if he does, he cannot avail himself of the law to enforce a contract made in opposition to law.　The plaintiff must recover upon his own merits; and if he has none, or if he discloses a case founded upon illegal dealing, and founded on an intercourse prohibited by law, he ought not to be heard, whatever the demerits of the defendant may be. There is, to my mind, something monstrous in the proposition, that a court of law ought to carry into effect a contract founded upon a breach

of law. It is encouraging disobedience, and giving to disloyalty its un-
hallowed fruits. There is no such mischievous doctrine to be deduced
from the books. There are cases in which a contract, fair and lawful, as
between the two individuals who are parties to it, is not to be contami-
nated by other transactions, which might precede, or which might be the
result of the contract. But even if an agent be a party to an original
transaction, and the money in his hand be the proceeds of the illegal
contract, no recovery can be had. (*Vide*, on this subject, Lord Kenyon,
and Ashhurst J. in *Taylor* v. *Blair*, 3 Term Rep. 454; Rooke J. in 1 Bos.
and Pull., 296; Story J. in *Fales* v. *Mayberry*, 2 Gallison, 560; *Hunt* v.
*Knickerbacker*, 5 Johns. Rep. 327; *Hodgson* v. *Temple*, 5 Taunton, 181;
*Faikney* v. *Reynous*, 4 Burr, 2069; *Petrie* v. *Hannay*, 3 Term Rep. 418;
and the disapprobation of those two cases, in 14 Vesey, 192, *ex parte*
Daniels.) Lord Alvanley lays down the true rule in *Monk* v. *Abel*, 3 Bos.
and Pull. 25,) when he declares, that "the principle to be extracted from
the cases on this subject is, that no man can come into a British court of
justice to seek the assistance of the law, who founds his claims upon a
contravention of the British laws.

I now conclude that, as the contract in this case was founded upon
dealings during the late war, between the plaintiffs, who were resident
citizens of the United States, and Henry W., who was a natural born and
a resident subject of Great Britain, it was an unlawful contract, and cannot
be enforced in the courts of this country.

Mr. Barker's bank has always been in the habit of receiving gold, sil-
ver, treasury notes and bank notes, paying its depositors in like funds,
without reference to the fluctuations in value. He was particularly un-
fortunate in relation to deposits of gold and silver, and the sale thereof,
the great advance being subsequent to his sales. This did not furnish
any excuse for not paying back gold to those who had deposited gold,
under the printed regulations of his bank.

Suppose that the deposit had been in counterfeit money, or a trunk of
plate, could the bank be considered answerable for anything else?

Ilsley, J. The plaintiff claims from the defendant, as the owner of
the Bank of Commerce, in New Orleans, the sum of four hundred dollars,
being the balance which he avers to be due to him, on moneys deposited
by him in said bank, between the 17th day of January and the 1st day of
April, 1862. He complains that this balance is due and payable to him
in legal tender notes of the United States, but that the said defendant
has illegally and wrongfully, without his consent, caused the plaintiff's
bank book to be balanced, as a balance of account in Confederate notes,
which the plaintiff himself terms "the treasonable issue of rebels in arms
against the United States."

All these allegations are traversed by the defendant, who, however,
admits that the said balance is correct as to amount, but sets up, in his
defence, a special contract, by which he avers that deposits were received
in his bank, at the period stated, only *on the condition* that the amount
was to be drawn for in Confederate currency. And he further specially
avers, that the balance of account was struck in the manner alleged by
the plaintiff, with his full knowledge, and at his special request.

SCHMIDT
*v.*
BARKER.

The only question at issue, then, between the parties, is the mode in which the admitted balance is to be drawn out of the bank; in legal tender notes or in Confederate notes.

In the absence of any special agreement, or understanding, between a banker and a depositor, when the deposit is an irregular one; when an account is kept; where moneys are deposited in bank, to be drawn out, not in the indentical funds deposited; where moneys deposited are mingled with the cash assets of the bank, and used indifferently with his own; the relations between a bank and its depositors are well and definitely fixed by our own law and jurisprudence, and by that of other countries in which business is transacted with such institutions.

Such deposits are not real deposits, but are loans for use to the banker, The money so deposited transfers the property to the loanee; and the relation between a bank and its customers, in regard to irregular deposits so made, is simply one of debtor and creditor. See Arts. L. C. 2904, 2883, 2934, 2884. See the case of *Matthews, Finley & Co.* v. *Their Creditors,* 10 An. 343; and that of *Sims* v. *Bean,* 10 An. 346; Grant on Banking, p. 1; *Marine Bank* v. *Fulton Bank,* Wallace's Report, 2 vol. p. 252.

But the defendant relies on his contract with the plaintiff; and, if the agreement is a legal one, he might well invoke Art. 1940 C. C.; which says that, "Legal agreements, having the effect of law upon the parties, none but the parties can abrogate or modify them, and it is incumbent on courts to give legal effect to all such contracts, according to the true intent of all the parties." See sec. 2 of the same Article.

What was the agreement between these parties? It is *that* produced by the plaintiff himself; and it precedes in the bank book the statement of the account. It is as follows:

"Bank of Commerce, New Orleans, January 17, 1862. Deposits in this bank are received only on condition that the amount is to be drawn in Confederate currency;" and the currency is what the plaintiff himself calls the treasonable issue of rebels in arms against the United States.

This court has often held that it will not lend its aid to settle disputes relative to contracts reprobated by law. It will notice their illegality *ex officio,* and allow it without any plea at any stage of the proceedings. Parties cannot be heard who ask relief from a violation of law. The law leaves them where their conduct has placed them, and *in pari causa melior est conditio possedentis. Davis* v. *Holbrook,* 1 An. 178; *State* v. *Lazarie et al.,* 12 An. 166; *Gravier's Curator* v. *Canaby's Executor,* 17 La. 132.

Article 2026, Louisiana Code, prescribes that "every condition of a thing impossible, or *contra bonos mores* (repugnant to moral conduct), or prohibited by law, is null and void, and renders void the agreement which depends on it;" and Pothier (art. 1, chap. 3, part 3) defines the conditional obligation as that "qui est suspendue par la condition sous laquelle elle a été contractée, qui n'est pas accomplie."

And in what light can this court, constituted as it is, and recognizing, as supreme and paramount to all other laws, the constitution and statutes of the United States, view a condition, on which a deposit is received, and which condition, voluntarily acceded to by the depositor, provides for and contemplates the aiding of the circulation of the treasonable issue of

rebels in arms against the United States; of an issue put in circulation for the express purpose of facilitating and carrying on the rebellion; and which issue, on the very face of it, anticipates and purposes a disruption and dismemberment of the general government : as the notes so issued were only to be payable "six months after the ratification of peace between the *Confederate States* and the *United States.*"

Such a condition in a contract is, in the words of the law, "a nullity, and renders void the agreement which depends on it."

The plaintiff was a party to this illicit contract, and his right to stand in judgment depends upon the nature of his connection with the obnoxious condition, and upon the contingency as to whether its illegality lies properly at his door.

Many of the French commentators draw a clear destinction between cases wherein both parties to the contract are compromitted illicitly, and where one alone is guilty of infringing the law.

Gilbert in his Code annoté, vol. 1, p. 503, in his notes to Article 1133 C. N., says: "Les auteurs distinguent sur ce point entre le cas où la convention est illicite seulement du côté d'une des parties, et celui où elle est illicite des deux côtés. Dans le premier cas, celui qui n'a rien promis d'illicite est fondé à répéter ce qu'il a payé; dans le second, ni l'une ni l'autre des parties ne sont admises à exercer des répétitions l'une contre l'autre." V. Pothier, No. 43 et suiv.; Toullier, t. 6, No. 126; Duranton, t. 2, p. 687; Delomcourt, t. 2, p. 687, edit. de 1819.

Cette distinction est prise de Paul et d'Ulpieu, dans les lois 3 et 4, §2, *de Condict ab turp causa.*

It is hardly necessary to add, as was said in the case of *Gravier's Curator* v. *Carraby's Executor*, 17 La. p. 128, that *a fortiori* the law will not lend its aid to enforce the performance of such contracts in the first instance. Duranton, with his usual aptness at illustration, demonstrates such a case as would save one of the contracting parties from the effect of an illicit agreement. It would be one in which his participation therein was caused by the force of circumstances that he could not resist, without entailing on him grievous injury. That author says: "Quelquefois cependant, la cause de l'obligation de l'une des parties est illicite, sans que l'objet de l'obligation de l'autre le soit: tel est le cas où vous vous obligez à me restituer un dépôt que mon père vous a confié, sans en avoir retiré une reconnaissance, et que vous exigiez une promesse de ma part de vous payer pour cela une certaine somme.

"L'objet de cette obligation, la restitution du dépôt, est très licite, mais la cause de mon obligation de vous payer la somme est illicite, non pas sans doute par rapport à moi, mais par rapport à vous qui avez exigé une promesse pour faire ce que l'équité et le droit vous obligeaient de faire sans aucune rétribution." Duranton, Art. 366, liv. 3, tit. 3.

In the example suggested by this author, he who binds himself unwillingly and under constraint is not deemed, in the eye of the law, a participant in an illicit covenant. But was this the case with the plaintiff in this suit? Clearly not; but the very reverse of it. His acquiescence in a contract that violated the law, and tended to endanger the public safety, was entirely voluntary, of his own free will, and with his eyes open.

34

His participation in the illegal contract was immoral, being, as it was, in violation of law. See the case of *Davis* y. *Holbrook*, 1 An. 175.

What was due to plaintiff by his contract with the defendant? Four hundred dollars in Confederate money. If the shadow of a legal cause of action were disclosed in this case by the plaintiff, it is so coupled with the illicit condition as to be inseparable from it.

The whole contract is an absolute nullity; and *quod nullum est confirmari nequit, quod nullum est, nullum producit effetcum.* "*Nemo auditur propriam turpitudine n allegans.*"

The doctrine taught by Chancellor Kent, in the case of *Griswold* v. *Waddington*, in the Court of Errors, New York, meets our fullest approbation. He says: "If from the plaintiff's own stating, the cause of action appears to arise from a transgression of a positive law of the country, the court will not lend their aid."

It would be difficult to state any principle of law more plainly founded on common sense and true policy, than that which declares that a plaintiff must not appear, from his own showing, to have infringed the law of the land; and, if he does, he cannot avail himself of the law to enforce a contract made in opposition to law. The plaintiff must recover on his own merits; and if he has none, or if he disclose a case founded upon illegal dealing, and founded on an intercourse prohibited by law, he ought not to be heard, whatever the demerits of the defendant may be.

"There is," says the Chancellor, "to my mind, something monstrous in the proposition that a court of law ought to carry into effect a contract founded upon a breach of law. It is encouraging disobedience and giving disloyalty its unhallowed fruits.

There is no such mischievous doctrine to be found in the books."

The judgment of the lower court, which was in favor of the plaintiff, must be reversed.

It is therefore ordered, adjudged and decreed, that the action of the plaintiff be dismissed, and that plaintiff pay the costs in both courts.

---

### SAME CASE.—APPLICATION FOR A RE-HEARING.

May it please your honors: The plaintiff and appellee, Schmidt, respectfully asks for a re-hearing in this case.

The plaintiff alleged, on the 2d day of June, 1864, that his balance of account in Jacob Barker's bank was $400, and that the same was payable to him in legal tender notes.

The relations between a banker and depositor are those of simple debtor and creditor, and the acts of Congress make treasury notes a "legal tender in payment of debts." Therefore, Barker, he said, owed him $400, in treasury notes, which was true, if Barker owed him anything at all.

The plaintiff also averred that recently, *i. e.* with regard to the filing of petition, 2d June, 1864, Barker had, in striking the balance of his deposit account, wrongfully, illegally, and without the consent of petitioner, stated this to be a balance of account in Confederate notes, which was

false, as the balance was simply, as appears by the book itself, one of <span>SCHMIDT<br>v.<br>BARKER.</span> "dollars," for which the United States treasury notes were a legal tender.

In answer to this, Barker says that plaintiff deposited with him the nominal amount of $1,350, in "Confederate notes, under a special contract to receive back the same description of paper;" to this is added the averments of many different agreements, on the part of plaintiff, to receive "Confederate notes" for his debt.

What was the proof in this case?

The defendant offered no proof at all. All the averments of his answer are therefore unsupported by evidence.

The circumstance that Barker annexes to and deposits with his answer certain four one-hundred-dollar Confederate notes, is of no value against the plaintiff, because those notes are not proved to be what plaintiff deposited. These were not offered in evidence on the trial of the cause in the court below; there was no evidence of any kind offered there in regard to them, and the Supreme court has no power to look at them at all, as instruments of proof to make out the defendant's case. For all purposes, they must be legally considered as not existing. They were filed by the defendant in the court below with his answer, but the record is destitute of all evidence about them; how can this court, then, allude to them at all? How does this court learn that these were the notes which plaintiff deposited with defendant?

Plaintiff has not admitted it. The defendant has not proved it. How, then, can this court take it for a fact.

Would not the case be a hard one for plaintiff if all the allegations defendants choose to put in their answers are to be taken as true, without proof?

The bank book of plaintiff does not say that the deposits were made in Confederate notes, but does say they were made "in cash." The memorandum at the foot of the account, defendant states to have been made in 1864, without his consent.

This is his admission, with regard to the entry, and there is no other proof in the record about it. His admission can only legally be taken as he makes it: it is, that he did not consent to the balance being struck payable in Confederate notes; that is all he admits. Why should this court take it for granted, in the absence of all proof on the other side, that he consented to a balance in Confederate notes, in May, 1864, two years after the circulation had been forbidden by the highest law of the department (State), and to him they were absolutely worthless. Nor is there any proof that the plaintiff deposited Confederate notes with defendant; the deposits are represented in the bank books as "cash." It is true that a memorandum above the deposit entries saying, that "the amounts are to be drawn in Confederate currency;" but, at that time, January 1862, the defendant may have considered this as a method of showing his devotion to the sacred cause of liberty and independence, in the fashionable phrase of that day. At that time, too, the court knew, as a matter of history, that the notes of the banks of New Orleans, and those issued by the city corporation, were in general circulation; so that it cannot be presumed, in the absence of proof, that the deposits were made in Confederate notes.

SCHMIDT
v.
BARKER.

Let us now suppose, in the absence of proof on the point, and for the sake of argument, that the deposits were made in Confederate notes, "the treasonable issue of rebels in arms against the United States" (a style of designation which is apparently attractive), what then? They are received and entered on plaintiff's pass book as "cash" in dollars. What was the effect of such an entry in plaintiff's book? Why, to make him a creditor of defendant for so many dollars! not the very dollars, recollect, which plaintiff deposited; for there is no question here really of the contract of deposit, but of the contract of loans for consumption.

The law governing their relations is, therefore, that of the Louisiana Code, Art. 2882. "By the effect of this loan the borrower becomes the owner of the thing lent, and if it be astrayed, in whatever manner the same may have happened, the loss is on his account."

If in this case the loan was made in Confederate notes, which we admit *argumenti gratia*, then, these having been destroyed, *i. e.* rendered worthless by the collapse of the rebellion, the loss is on the defendant.

But the text and provisions of our code do not stop here. Article 2884 says: "The obligation which results from a loan of money can never be more than the numerical sum mentioned in the contract." But that he is bound to pay! He must pay the numerical sum, which means the number of the standard (in this case dollars) mentioned in the contract.

And, says the same Article in continuation: "If there has been augmentation or diminution of the value of the specie" (*i. e.* the kind of currency loaned) "before the time of payment, the debtor is bound to return nothing more than the numerical sum" (and consequently he can return nothing less than that) "in such specie as has currency at the time of the payment."

In the case at bar, the time of payment was the months of May or June, 1864, when the bank pass-book was balanced, and when "Confederate notes" were not only worthless, but prohibited as a circulating medium; according to the Code, then, the depreciation must be borne by Barker, and he must pay the sum loaned him in "legal tender," the specie which has currency at this time.

The proclamation of May 1st, 1862, issued by the major-general commanding the national forces, declared that the circulation of Confederate notes was permitted "until further orders." See General Order, No. 1, May 1st, 1862.

On the 16th May, 1862, the major-general, by Order No. 29, prohibited all circulation of or trade in Confederate notes, after the 27th May, 1862.

And by General Order No. 30, 19th May, 1862, after setting forth, in the strongest terms, the treason and bad faith of the public and private bankers of New Orleans, the major-general commanded: "II. That all private bankers, receiving deposits, pay out to their depositors only the current bills of the city banks, United States treasury notes, gold or silver."

This is the supreme law of the department (State of Louisiana), has been, since 1862, and is now in full force, and of higher force than any statute of Louisiana.

Re-hearing refused.