SAMUEL PELTZ, Respondent, *v.* HENRY W. LONG, Appellant.

*Contracts—Notes—Rebel Enemy.*—No cause of action can arise out of an illegal consideration. A note given within the rebel lines during the civil war, and founded upon a consideration of goods sold to be paid in Confederate notes, and Confederate notes lent, is founded upon an illegal consideration, and the courts will not permit any action to be sustained therefor.

*Appeal from St. Louis Circuit Court.*

The court at request of respondent gave the following instructions:

1. Although it appear that the plaintiff holds the note in question for collection merely, he is still entitled to bring suit upon the same and recover thereon, provided the payees thereof were so entitled.

2. Although the jury believe from the evidence that a portion of the consideration of the note in question was "pretended paper money called Confederate notes or bonds," and that the same were void in law, and finally became worthless in fact, still the plaintiff is entitled to recover if he believed that the said notes or bonds were actually current at the time defendant so received them, unless the defendant further show that the identical notes or bonds so received by him proved worthless in his hands, or that he was compelled to take them back to whom he had paid them.

3. The plaintiff is entitled to recover unless the defendant show affirmatively that one or more of the payees of said note did after the 17th day of July, 1862, " engage in, aid or abet the rebellion against the Government of the United States," and did not within sixty days after the proclamation of the President, dated 25th'July, 1862, "cease to aid, countenance and abet such rebellion," or that one or more of said payees was at the time of the commencement of this suit resident of or within a State declared to be in insurrection, and of a portion thereof not excepted by proclamation of the President.

*Geo. P. Strong*, for appellant.

The contract which was entered into by defendant with plaintiff when he gave this promissory note for tin ware at its supposed value in Confederate money, and for a loan of Confederate money, was illegal and against public policy inasmuch as it aided in giving value and circulation to these "Confederate notes," which were issued under the authority of armed insurgents, and were used to carry on and support a treasonable conspiracy against the Government of the United States. It was therefore a contract void, as being in contravention of the established interests of society and against public policy—1 Sto. Cont. §§ 545, 546, 569, 587, (n. 2 p. 716,) 608, 610, 615, 624, 461.  Contracts against public policy : Coal Co. v. Norris, 2 Wall. ( U. S.) 45 ; 1 Pars. Cont. (5th ed.) 456–7, book 1, ch. 1, § 12 ; Brown v. Larkington, 3 Wall. (U. S.) 377 ; Brooks v. Martin, 2 id. 70–9 ; Schmidt v. Barker, 17 Lou. Ann. 261 ; Laughlin v. Dean, 1 Duvall (Ky.) 20 ; Armstrong v. Loler, 11 Wheat. 258.

The authorities thus cited show that any contract which is based upon acts prejudicial to the public interests, in violation of sound morals, or against public policy, cannot be enforced in the courts of the country.  Parties to such contracts will be left just where the court finds them.

No contract could be more offensive to public policy or good morals than one which had its foundations in transac-

tions respecting the purchase of goods, sold at prices which by express or implied contract were to be paid in Confederate money.

There must have been another violation of public law, which only appears incidentally in the case. The goods sold were tin ware, and the tin ware must have been imported ; so that this rebel officer was not only dealing in Confederate money, but was also directly or indirectly violating the blockade. But this objection was not essential, as the note in suit is unquestionably tainted with a fatal violation of public duty.

Whoever received this Confederate money had a direct interest in sustaining the rebellion, by the success of which alone the money could have any value. It is matter of public notoriety that the rebellion was sustained for years by the issue and forced circulation of this Confederate money. It was made a legal tender for debts. Every man who dared refuse it was proscribed and driven from the country, or subjected to barbarous treatment while he remained there; and one of this firm who now asks this court to enforce this tainted contract for his benefit, was actually engaged in compelling the circulation of this treasonable currency. The note was given while he was actually engaged in resisting the attempt of the lawful authorities to enter the city of New Orleans.

Could there be a combination of circumstances which would more clearly justify a court in holding a contract null and void, and turn a plaintiff out of court, than is found in this case ?

*S. S. Boyd,* for respondent.

I. Could the payees and appellant enter into any contract?

1. Had they been subjects of a foreign power at war with the United States, their right to enter into contract would be unquestioned ; and being citizens of the United States residing in a rebel State, they have the same power to contract, unless there is some express prohibition in the laws of the

United States. The laws passed in regard to commercial intercourse must govern in this case; they only prohibit commercial intercourse, meaning thereby to include all contracts between citizens of an insurrectionary State and a "citizen of other States and other parts of the United States"—Laws U. S. 1861, p. 257, § 5; Proc. in App. V.

2. This does not include intercourse or contracts made with citizens of some State not within the lines of the United States—Laws U. S. 1863-4, p. 376, § 4.

II. Was the contract in question valid?

1. It having been shown that the parties could contract, it follows that the same rules of law are applicable to their contract when made, as would have been had there been no civil war.

2. In determining whether an act is illegal, fraudulent, or against public policy, and thereby rendering a contract void, courts cannot take into consideration the greater or less injury that may result from such act. If it is illegal or fraudulent or against public policy, it matters not how evil may be the consequences, or how little injury may result; the contract is equally void in either case.

3. This contract was not illegal, fraudulent, or against public policy—1 Wall. (U. S.) 73; 3 id. 377; 11 How. 520; 17 Wend. 170; 11 Wheat. 272; 1 Watts & S. 315; 5 Taunt. 182; 13 Mass. 33.

4. Civil war existed in this country after the 13th July, 1861, and the people of the rebel States were all enemies, and owed a qualified allegiance to the State of their domicil, and their persons and property are subject to its laws—2 Black, 635. Consequently, if they contract they must do so according to the laws of their domicil; and if Confederate notes are the only money in circulation, they must base their contracts on these, and pay and receive them in their transactions.

5. There was no failure or want of consideration—37 Mo. 371; 9 Ind. 135; 1 Morris, 312; 5 Fla. 150; 1 N. H. 174;

Peltz v. Long.

23 Pick. 283; 2 Hill, 606; Smith on Cont. 87; Add. on Cont. 27; 3 Ind. 39; 8 Yerg. 176.

III. Could the payees bring suit in a loyal State?

1. They lived in New Orleans, which since 1st January, 1863, has been exempted from among the insurrectionary districts, and its inhabitants therefore, saving their liability to be punished for their treason, were on the same footing as any other citizen of the United States in respect to their right to a *status* in the courts of a loyal State—Laws U. S. 1862–3, App. III.; id. 1863–4, App. I.

2. Punishment for treason is well defined, and prior to July 17, 1862, the guilty party, before conviction, had all the rights of other citizens, and among them the right to a standing in court; this is evident from the following: Laws U. S. 1861–2, p. 591, § 6; id. App. IV.

3. The act of July 17, 1862, has no application here, for there is not one tittle of evidence to prove these payees amenable to its provisions. The simple allegation of the facts therein set forth as constituting a bar will not suffice; there must be positive proof of the facts by the party relying upon them as a bar. Even if it be believed that one or more of the payees were in arms prior to 17th July, 1862, no presumption follows that they continued so; but, on the contrary, every legal presumption is in favor of innocence and that they obeyed the law.

WAGNER, Judge, delivered the opinion of the court.

This was an action commenced in the court below on a promissory note made in New Orleans on the 20th of March, 1862, by Long to the firm of Austin, Goodwyn & Co., for the sum of $2,323.03, and by them assigned to Peltz, the respondent. It is admitted that the note was assigned after maturity and merely for collection, and that Austin, Goodwyn & Co. are the real parties in interest, and no question arises in regard to the rights of the endorsee.

The defence set up is that part of the consideration given

for the note was Confederate money issued by authority of the States lately in rebellion, and that the balance was for articles purchased by Long of Austin, Goodwyn & Co. at a price about three times their value in legal currency, and which were to be paid for in Confederate scrip; and also that the members composing the firm of Austin, Goodwyn & Co. were rebels engaged in resistance to the lawful authority of the Government.

Upon a trial before the court without a jury, judgment was rendered for the respondent.

The evidence abundantly proves that Goodwyn was an officer in the rebel service; that he left the camp and went to New Orleans to make a settlement with Long before the United States forces took possession of that city, and that the note given was the result of the settlement; that he gave to Long five or six hundred dollars in Confederate money, which was included in the note; and that the remainder was for articles sold at Confederate prices, and for which Confederate money was to be received in payment.

That all contracts which are immoral in their nature, or contrary to public policy, or contravene any established interest of society, are void and incapable of enforcement, must be considered as settled propositions of law. It is not necessary that the contract should be expressly illegal; but whenever it is opposed to public policy, or founded on an immoral consideration, no action can spring out of it, the maxim being *ex turpi causa non oritur actio.* In such cases the law will not intervene in behalf of parties who present themselves in the attitude of wrongdoers; it will not listen to their prayers for relief, but will leave them just where their conduct has placed them. Therefore Ld. Mansfield, in Smith v. Bromley, Doug. 695, says: "If the act is immoral in itself, a violation of the general laws of public policy, then the party paying shall not have his action (to recover back the money); for where both parties are equally criminal against such general laws, the rule is *potior est conditis defendentis.*" Chancellor Kent, in Griswold v. Waddington,

16 Johns, 486, in one of the ablest opinions that ever ema-
nated from his luminous mind, remarks: "The plaintiff
must recover upon his own merits, and if he has none, or if
he discloses a case founded upon illegal dealing and founded
on an intercourse prohibited by law, he ought not to be heard
whatever the demerits of the defendant may be. There is to
my mind something monstrous in the proposition that a court
of law ought to carry into effect a contract founded upon a
breach of law. It is encouraging disobedience and giving to
disloyalty its unhallowed fruits. There is no such mischiev-
ous doctrine to be deduced from the books." Ld. Alvanley,
in Monk v. Abel, 3 Bos. & P. 35, declares that "the princi-
ciple to be extracted from the cases on this subject is, that
no man can come into a British court of justice to seek the
assistance of the law, who founds his claims upon a contra-
vention of the British laws." Such contracts have a tend-
ency to familiarize the mind with fraud, to weaken and
destroy the force of just and lawful restraint, and induce a
defiance of legal obligations, and ought therefore to be re-
jected. They are, in the expressive and characteristic lan-
guage of Ld. Ch. Justice Wilmot, contracts "to do that which
is injurious to the community ; and the reason why the com-
mon law says says that such contracts are void, is the public
good. You shall not stipulate for iniquity."

Obligations arising out of contracts made during the time
of the rebellion, and where Confederate money was agreed
to be taken, or constituted the consideration passing between
the parties, have been on several occasions the subjects of
litigation. In the case of Schmidt v. Barker, 17 La. Ann.
261, the plaintiff claimed from the defendant, who was a
banker in New Orleans, the sum of four hundred dollars, be-
ing the balance which he averred was due to him on moneys
deposited by him in defendant's bank between the 17th day
of January and the 1st day of April, 1862. The amount was
claimed to be due in legal tender notes of the United States;
but the defendant set up in his defence a special contract, by
which it appeared that the deposits were received in his bank

at the period stated, only on the condition that the amount was to be drawn for in Confederate currency. It appears from the report that the deposits were made by the plaintiff in the same kind of currency. The court held that the transaction was totally illegal and void, that no cause of action would spring out of it, and gave judgment for the defendant.

The case of Laughlin v. Dean, 1 Duv. (Ky.) 20, was a suit upon a note. The answer alleged and the defence showed that the consideration for the note was the purchase of Confederate notes. It was decided that the action could not be maintained, and that the policy of the State forbade its courts from aiding either of the parties to a contract for the sale or purchase of Confederate notes.

In a very recent case in Mississippi (Avera v. Robertson), Mr. Justice Clayton decided that the issuance of treasury notes by the Congress of the Confederate States was done by virtue of the war power in the constitution, and was the exercise of a belligerent right; that the abolition of the rebel debt by the superior power, the extinction of the government which created it, and the annulment of the laws which gave it vitality, made it impossible to recover on the notes themselves, and that the condemnation adhered to them even in a secondary transaction. Nor is there any force in the suggestion, that although the plaintiff may be debarred from recovering so much as is shown to have been paid in Confederate notes, yet that only goes partially to the consideration, and that the balance is good, and judgment should be rendered for it. This is not the case where the law allows a distinction to be taken where the consideration is illegal in part, and there are separate promises founded on partly legal and partly illegal considerations. It is an entire promise, and if any part of the consideration is illegal, the whole consideration is void ; public policy will not permit a party to enforce a promise which he has obtained by an illegal act or an illegal promise, although he may have connected with this act or promise another which is legal—1 Pars. on Cont. (5th ed.) 457.

In what light can this court, recognizing as it does in the fullest and broadest extent the Constitution of the United States and the laws passed by the Federal Congress as supreme and paramount, view the claims of a party when he comes here and asks indemnity for an act which was calculated and intended to disrupt and dismember the general government and destroy the national fabric. To say that his acts and contracts were against public policy is indeed a very mild characterization. Money was indispensable; it was the very sinew necessary to enable the Confederates to carry on their bloody strife and prosecute their purpose of dissolving the Union, and whoever gave credit to their currency must be adjudged to be a *particeps criminis*. The parties sold their merchandise for Confederate money, thus giving it credit, countenance and circulation; and, in addition, one of them at least was in open and armed rebellion, giving material and physical aid to sustain its character, and ultimately provide for its redemption, as it was made payable after a treaty of separation between the Confederate and the United States. Each part of the transaction adheres to the other and makes the whole entirely void; no relief can be obtained in a court of justice, and the parties must remain where they have placed themselves by their own conduct.

With the concurrence of the other judges, the judgment is reversed.