## UNITED STATES *v.* LAPÈNE.

In February, 1862, while the whole State of Louisiana, including the city of New Orleans, was under the civil and military control of the rebels of the late rebellion, a mercantile firm in New Orleans sent their agent into certain interior parishes of the State to collect, money due to the firm and to make purchases of cotton. After the agent had got into the interior parishes, but before he had bought any cotton, the city of New Orleans, where his principals were, was captured (April 27th, 1862), by the forces of the United States, and remained from that time under the control of the government, the interior parishes, however, still remaining in the control of the rebels. Subsequently to this the agent made purchases of cotton from persons in these interior parishes, still, as just said, under the control of the rebels. *Held* that the firm was guilty of trading with the enemy, and that the property was rightly taken by the Federal government.

APPEAL from the Court of Claims; the case being thus:

" On the 20th of February, 1862, while the whole State of Louisiana, *including the city of New Orleans,* was in the possession and under the control of the rebels, Lapène & Ferré, a mercantile firm in the said city, sent their travelling clerk from the said city of New Orleans into certain parishes in the interior of the State, to collect moneys due to the firm there, and gave him authority to purchase sugar and cotton for the firm.

" In March or· April, 1862, they requested one Avegno, who was then going from New Orleans to the said parishes, to remit to their said clerk the sum of $5000, and to assist the said clerk in the business of buying sugar and cotton. Avegno agreed to do this; and, in pursuance of his agreement, did deliver the said sum to the said clerk, in the said interior parishes, then in the possession and under the control of the rebels.

" While the said clerk and the said Avegno were in the said parishes, on the 27th day of April, 1862, the city of New Orleans was captured by the United States forces, and thenceforth through the whole term of the rebellion was held by those forces.

"*After* the said capture, the said clerk with the said sum of $5000 and other moneys collected by him in the said parishes, which parishes were, when the purchases were made, in the possession and under the control of the rebels, bought in different lots a quantity of cotton, and left it at the places where it was purchased.

"He returned from those parishes to New Orleans on the 14th of July, 1862. There was no evidence of any communication having been had between him and Lapène & Ferré, in relation to the said purchases of cotton, between the capture of New Orleans and his own return to that city, except the aforesaid delivery to him by Avegno of the said $5000.

"The cotton so purchased remained at the points at which it was purchased until April and May, 1863, when it was captured by military forces of the United States and shipped to and received by the Federal authorities at New Orleans."

Hereupon Lapène & Ferré filed a petition in the Court of Claims, claiming the cotton or the proceeds of it as their property; and the Court of Claims decreed that it belonged to them. From this decree the United States took the present appeal.

*Mr. S. F. Phillips, Solicitor-General, for the appellant,* relied on *Griswold* v. *Waddington,** United States* v. *Grossmayer,†* and *Montgomery* v. *United States.‡*

*Mr. W. P. Clarke, contra,* sought to distinguish the case from the cases mentioned, and relied on *United States* v. *Anderson.§*

Mr. Justice HUNT delivered the opinion of the court.

All commercial contracts with the subjects or in the territory of the enemy, whether made directly by one in person, or indirectly through an agent, who is neutral, are illegal and void. This principle is now too well settled to justify

---

* 15 Johnson, 57; 16 Id. 438.          † 9 Wallace, 72.

‡ 15 Id. 395.          § 9 Id. 56.

discussion.* No property passes and no rights are acquired under such contracts.

In March, 1862, the whole of the State of Louisiana was in the military possession of the Confederate forces. Intercourse between the inhabitants of the different portions thereof was legal, and contracts made between them were legal.

On the 27th of April, in the same year, the city of New Orleans was captured by the military forces of the United States, and thereafter remained under their control. From that time commercial intercourse between the inhabitants of that city and the inhabitants of other portions of the State of Louisiana which remained under the Confederate rule became illegal. Ordinarily the line of non-intercourse is the boundary line between the territories of contending nations. The recent war in the United States was a civil war, in which portions of the same nation were engaged in hostile strife with each other. The State of Louisiana, although one of the United States, was under the control of the Confederate government and their armies, and was an enemy's country. While the city of New Orleans was under such control it was a portion of an enemy's country. When that city was captured by the forces of the United States, the line of non-intercourse was changed, and traffic before legal became illegal. This line was that of military occupation or control by the forces of the different governments, and not that of State lines. This principle was expressly decided in *Montgomery* v. *United States.*† There the cotton sold was in the parish of La Fourche, a parish of the State of Louisiana, and belonged to Johnson, an enemy domiciled in an enemy's country; to wit, the parish of La Fourche, in the same State. The sale was made by an agent of Johnson, in the city of New Orleans, to Montgomery, a British subject. This court held the sale to be void and that no title passed to Johnson.

Like that in Montgomery's case, the agency here was cre-

* Woolsey's International Law, § 117; Montgomery v. United States, 15 Wallace, 395.

† *Supra.*

ated, while it was legal to create an agency. In each case, also, existed the important fact that the transaction of purchase took place after the parties became residents of hostile portions of the same State. Burridge was appointed the agent of Johnson in Montgomery's case, as was the agreement in this case made with Avegno, and the money advanced by him, while the parties were all residents of and under the control of the Confederate government. But the cotton was sold by Burridge, as here the cotton was purchased by the clerk after this relation had ceased. In each instance the purchase of the cotton was a transaction with an alien enemy.

The agency to purchase cotton was terminated by the hostile position of the parties. The agency to receive payment of debts due to Lapène & Co. may well have continued. But Avegno was no debtor to that firm. He advanced money to their agent when it was legal to do so. With this money, and other moneys belonging to them, while in an enemy's country, the agent of the plaintiffs bought the cotton in question. This purchase gave effectual aid to the enemy by furnishing to them the sinews of war. It was forbidden by the soundest principles of public law. The purchaser obtained no title to the cotton, and has no claim against the government for its capture.

JUDGMENT REVERSED.

Dissenting, Mr. Justice MILLER and Mr. Justice FIELD,