In re PROBATE OF WILL OF ANNA KIELSMARK.

ELIAS P. BIEBER, Appellee, v. HANS IVERSEN et al., Appellees; A. MITCHELL PALMER, Alien Property Custodian, Appellant.

**WILLS: Validity of Devise to Alien Enemy.** A devise to an alien enemy is valid, but the court will retain jurisdiction over the property until peace is declared.

*Appeal from Grundy District Court.*—CHARLES W. MULLAN, Judge.

MAY 15, 1920.

ACTION to probate a will. The sole question presented is whether or not a devise of property to an alien enemy is in contravention of the public law and the act of Congress referred to in the opinion. The invalidity of the devise was raised by heirs residing in this country. The court held the devise invalid. Appeal to this court. The opinion states the facts.—*Reversed and remanded.*

*Williamson & Willoughby* and *Emmet Tinley*, for appellant.

*A. G. Briggs* and *Briggs, Thygeson & Everall*, for appellees.

GAYNOR, J.—Anna Kielsmark died on the 7th day of August, 1917, testate, leaving surviving her, as her only heirs at law, the following named persons: Marie, Elizabeth, Peter, and Christian Vodder, children of a deceased sister, and Hans and Oluf Iversen, children of another deceased sister. On the 15th day of August, 1917, an instrument purporting to be her last will and testament was filed in the district court of Grundy County, Iowa, for probate. The Vodders were all born in Germany, and, during all the times hereinafter mentioned, were actual residents and citizens of Germany, and are still residents and citizens of Germany. Hans Iversen and Oluf Iversen are residents of the United States, residing at St. Paul, Minnesota. Hans Iversen, at the time of the filing of the will, had declared his intention to become a citizen of the United States, but had not been naturalized. It does not appear whether Oluf had declared his intention to become a citizen or not.

War was declared by the United States against the imperial German government on the 10th day of April, 1917.

On the 24th day of July, 1917, the will was made, and on August 15, 1917, was filed for probate. On the 2d day of January, 1918, Hans Iversen and Oluf Iversen appeared, and filed objections to the probate of the will, on the ground that a state of war existed between the United States of America and the imperial government of Germany at the time the will was made, and still exists, and that the parties named in the will as beneficiaries, to wit, Marie and Elizabeth Vodder, were and are alien enemies. On these facts, objectors predicated a claim that the bequest to these Vodders was absolutely void, and that, as to the property

attempted to be devised to them, Anna Kielsmark died intestate.

The will, so far as material to this controversy, recites:

"That I, Anna Kielsmark, of the town of Reinbeck in the county of Grundy, in the state of Iowa, being of sound mind, etc., do here make, execute, publish and declare this my last will and testament.

"1st. I provide that all my just debts and expenses be paid out of my estate.

"2d. A bequest of $100 to the Ladies' Aid Society of the Congregational Church.

"3d. Instructions to the executor to hold $100, invest the same and pay the income each year therefrom to the Reinbeck Cemetery Association for the purpose of keeping up her burial lot in the cemetery.

"4th. [The clause in controversy.] I have two nieces at this time in Germany, to wit: Miss Elizabeth Vodder and Miss Marie Vodder and I hereby instruct my executor to communicate with them as soon as possible in case they shall not have arrived in Reinbeck prior to my death; he shall invite them to move to Reinbeck; in case they or either of them, come, they shall have the home in Reinbeck, being the only real estate in the said town of Reinbeck, in Grundy County, Iowa, and I hereby give the same to them, together with all the furniture and personal effects therein; *my executor shall hold the said property and care for the same until they come, or until five years from the close of the present European War,* and if he hears from them, and they or either of them, come to Reinbeck to live, she or both of them, shall have the said home in absolute title; in case he hears from them and they neither of them desire to come to America, then he shall sell the said house and the proceeds thereof shall be divided between them and he shall also pack up my smaller effects and send to them. In case either of said nieces shall not be living at that time, then the survivor

shall take half the said property, and the remaining half shall be divided between the persons named in the next paragraph."

The next paragraph provides for the disposition of the property in the event the two Vodders named in the will are dead.

Elizabeth and Marie Vodder were both living at the time the will was offered for probate, and at the time of the trial. So far as this controversy is concerned, all the facts material were stipulated between the parties. The stipulation shows the facts above recited, and that, during all of the time mentioned, Elizabeth and Marie Vodder were and still are alien enemies of the United States of America, residents and citizens of Germany; that testatrix, Anna Kielsmark, resided in the town of Reinbeck, in Grundy County, at the time of her death;- that she had lived there for something more than 30 years, and was a citizen of the United States. Upon the hearing, A. Mitchell Palmer, alien property custodian, appeared by attorneys Williamson & Willoughby, and joined with the proponent in an effort to have the will probated and made effectual. The court, upon the final hearing, found the facts as herein recited, and concluded therefrom that any attempt on the part of Anna Kielsmark to devise to these nieces any part of her estate was an attempt to furnish aid and comfort to the enemy, and that, therefore, the provision of the will by which the property of the testator was attempted to be given to Elizabeth and Marie Vodder was and is void. The will in all other respects was upheld. The decree recites that the entire estate, except the bequests in the second and third paragraphs, descended to the legal heirs of Anna Kielsmark on her death, according to their respective shares, as fixed by the statute of the state of Iowa; that Hans Iversen and Oluf Iversen, being residents of the United States, were entitled to have paid over to them by the

executor the shares of the estate of the testatrix to which they are respectively entitled, as heirs at law; that the shares of Marie, Elizabeth, Peter, and Christian Vodder, as heirs at law, should at once be taken possession of by the alien property custodian, and dealt with according to the laws of the United States relating to alien enemy property, and that the shares of these Vodders should be delivered by the executors to the alien property custodian.

The only question presented is whether or not the provision of the will by which Anna Kielsmark devised her property to these two nieces is void, on the sole ground that they were alien enemies of the United States at the time the bequest was made, and at the time the will was presented for probate.

Much learning has been expended on this question. It is a mere fiction of the law that all citizens of one country at war with another are each the enemy of the other. It is a fiction, however, indulged in to justify, in a measure, the rule that prohibits intercourse between citizens of countries at war with each other. The innocent suffer for the good of the whole people. It is a general principle, recognized and enforced by the courts of all civilized countries, that war operates as an interdiction on all commercial or other specific intercourse and communication with a public enemy. The courts of England and the courts of this country have spoken upon the question, and have recognized that, during war, all trade and intercourse between the citizens or subjects of one of the belligerent states or powers with those of the others are inimical to the best interests of each, except it be by license or permission of the government. So it follows that, without license, all commercial transactions, all trading between citizens of states or nations at war, are unlawful, and all contracts growing out of such trading, or out of voluntary intercourse with a public enemy, are void, and that no valid con-

tract can exist, nor any promise arise, by implication of law, from any transaction with an enemy, without permission from the government. See *Hill v. Baker,* 32 Iowa 302; *Rice v. Shook,* 27 Ark. 137 (11 Am. Rep. 783); *Billgerry v. Branch & Sons,* 19 Gratt. (Va.) 393 (100 Am. Dec. 679); *Statham v. New York Life Ins. Co.,* 45 Miss. 581 (7 Am. Rep. 737); *Potts v. Bell,* 8 Term Rep. 549; also, authorities collated on page 686, L. R. A. 1917C; *United States v. Lapene,* 17 Wall. 601 (21 L. Ed. 693).

After the breaking out of war between Germany and the United States, Congress passed an act providing, among other things:

"That it shall be unlawful for any person in the United States, except with license of the president, granted to such person, * * * to trade, or attempt to trade, either directly or indirectly, with * * * any other person, with knowledge or reasonable cause to believe that such other person is an enemy, or ally of enemy." 40 St. at L. 412.

Further, that:

"No conveyance, transfer, delivery, payment, or loan of money or other property, in violation of [the foregoing provisions] made after the passage of this act, and not under license as herein provided shall confer or create any right or remedy in respect thereof." 40 St. at L. 417.

The act defined the words "to trade" as follows:

"(a) Pay, satisfy, compromise, or give security for the payment or satisfaction of any debt or obligation.

"(b) Draw, accept, pay, present for acceptance or payment, or indorse any negotiable instrument or chose in action.

"(c) Enter into, carry on, complete, or perform any contract, agreement, or obligation.

"(d) Buy or sell, loan or extend credit, trade in, deal

with, exchange, transmit, transfer, assign, or otherwise dispose of, or receive any form of property.

"(e) To have any form of business or commercial communication or intercourse with" an enemy. 40 St. at L. 412.

We do not find that it has ever been expressly held that the law of nations, as judicially declared, renders void a devise made to an alien enemy. We do not find it so held in direct terms, and we think there is reason for distinguishing the act of devising property to an alien from those transactions heretofore held void, especially when the devise, relates to real estate. Nothing passes to the enemy at the time of the making of the will. The making of the will involves no personal transaction between the devisee and testator. Nothing passes at that time, nor can anything pass until the death of the testator. On the probate of the will, an executor is appointed, who serves as custodian of all the property, under the direction of the court. No action can be maintained by the alien to recover the property, or the increment of the property, while a state of war exists, and he acquires no dominion over it, either for use or service. A bequest by one relative to another, though the other be an alien enemy, does not even remotely suggest a purpose to give aid or comfort to the alien enemy, and does not, and in the nature of things cannot, tend to increase his resources. As said by Justice Gray, in *Kershaw v. Kelsey,* 100 Mass. 561, 573:

"At this age of the world, when all the tendencies of the law of nations are to exempt individuals and private contracts from injury or restraint in consequence of war between their governments, we are not disposed to declare such contracts unlawful as have not been heretofore adjudged to be inconsistent with a state of war."

Justice Gray, in that case, further said, at page 572:

"The result is that the law of nations, as judicially de-

clared, prohibits all intercourse between citizens of two belligerents which is inconsistent with the state of war between their countries; and that this includes any act of voluntary submission to the enemy, or receiving his protection; as well as any act or contract which tends to increase his resources; and every kind of trading or commercial dealing or intercourse, whether by transmission of money or goods, or orders for the delivery of either, between the two countries, directly or indirectly, * * * or by contracts in any form looking to or involving such transmission. * * * Beyond the principle of these cases, the prohibition has not been carried by judicial decision."

· What was said there by Justice Gray was quoted with approval by the Supreme Court of the United States in *Williams v. Paine,* in an opinion written by Justice Peckham, 169 U. S. 55 (42 L. Ed. 658).

It will be noted that the devisees Marie and Elizabeth Vodder were not represented in the trial of this case, except by the alien property custodian, and it will be noted that he is insisting, on the part of the government, that the devise be declared valid, and is asking that the property so devised be turned over to him for the use and benefit of the government. The custodian alone has appealed. Justice Fields, in dealing with an act of Congress not unlike the one here under consideration, in *Corbett v. Nutt,* 77 U. S. 464 (19 L. Ed. 976), said:

"If the devise of Mrs. Hunter can be brought within the language of the last section, it must be because a devise is embraced within the terms 'sales, transfers, and conveyances;' and because her 'aiding and abetting' the rebellion * * * are legitimate and necessary inferences from her voluntary and continued residence within the Confederate lines. * * * Assuming, however, that a devise is within the 'sales, transfers, and conveyances' invalidated by the act, and that Mrs. Hunter is within the

category of persons for whom the warning and proclamation of the president were intended, we are of the opinion that the invalidity declared is limited, and not absolute; that it is only as against the United States that the 'sales, transfers, and conveyances' of property liable to seizure are null and void; and that they are not void as between private persons, or against any other party than the United States. * * * It was to prevent these provisions from being evaded by the parties whose property was liable to seizure that 'sales, transfers, and conveyances' of the property were declared invalid. They were null and void, as against the belligerent or sovereign right of the United States to appropriate and use the property for the purposes designated, but in no other respect, and not as against any other party. Neither the object sought nor the language of the act requires any greater extension of the terms used. The United States were the only party who could institute the proceedings for condemnation; the offense for which such condemnation was decreed was against the United States; and the property condemned, or its proceeds, went to their sole use. They alone could, therefore, be affected by the sales."

This case is not directly in point on the question here under consideration; but, in a general way, it has a bearing upon the question here to be determined.

It will be borne in mind that Anna Kielsmark was a resident and a citizen of the United States; that she was the owner of the property, and acquired and held such ownership under the laws of the United States; that she had a right to convey and dispose of this property as she saw fit; that she had a right to bequeath it to aliens, and aliens had a right to take it under the bequest. The only question legitimately presented to the court was whether or not the instrument was the last will and testament of Anna Kielsmark, executed in conformity with the laws of

this state, and whether or not she had testamentary capacity, at the time, to make the will. The effect of the will, when executed, presented an entirely different question; but the parties, waiving the form in which the question was raised, have presented to us the sole question whether or not, when properly probated, the instrument is effectual as a devise of property within this state, and whether or not the interdiction of public law, based upon public policy, or the act of Congress, hereinbefore referred to, makes it void. We cannot construe the making of a will as within the inhibition of either the general law or the act of Congress. It certainly is not an act of trading, nor can it legitimately be brought within any of the definitions of trading, as made by the act itself. We must assume that the testator had a knowledge of the law; knew that any devise which she made would subject the property to confiscation by this government; knew that the devisees could not maintain any action to recover the property or the rent and profits accruing from the property during the continuance of the war; knew that the devisees could get no benefit from the property until after peace was declared. The time of her death was uncertain. The time when the will would become effectual was uncertain. Further, it was provided in the will itself,—and this negatives the thought that she was comforting the enemy:

"My executor shall hold the property and care for the same until they come, or until five years from the close of the present European War."

She expressly provided that her executor, a resident and citizen of this country and this state, should hold the property until five years from the close of the war, unless the devisees became residents of this country, and residents of the place in which the property was situated. We think the fairer and better rule is that which was suggested and followed in *Weiditschka v. Supreme Tent of Knights of*

*Maccabees,* 188 Iowa 183. In that case, the answer raised the issue that the heirs of the insured person 'were residents and citizens of Germany, and therefore, as such, not entitled to take, and any bequest to them was void. In that case, it was said:

"The object is not to defeat the alien enemy of his right to recover whatever may be owed to him, nor to shield the citizen from the enforcement of his just obligations, but to obviate the deriving of any advantage by the enemy, directly or indirectly, pending hostilities. These reasons have persuaded many courts to postpone, rather than abate, actions begun before the countries were engaged in war."

Our conclusion is that, instead of declaring the devise invalid, the court should have declared it valid, and ordered the executor to retain the property until such time as peace was declared between this country and Germany. This construction of the law is in accord with that innate sense of fairness, decency, and justice which ought to exist between civilized countries, even in time of war, and to require courts, that believe in international rights, to be more careful to preserve them. To this end, the property of the German citizen may be preserved until such time as peace is declared, subject only to the rights of the government to take it, under any act providing for the forfeiture of alien property to the government. In *In re Boussmaker,* 13 Vesey 71, the court allowed the claim of an alien enemy to be proved in time of war, and the dividends held by the British court until peace. In the *Weiditschka* case, it was said:

" 'Indeed, the fact that our country is now at war with Germany is all the more reason why this court should most scrupulously award to this German citizen those international and equitable rights which no fair-minded people ever deny, even to their enemies in times of war.' "

Upon the whole record, we think the case should be re-

versed, and it is reversed, with order to enter decree in harmony with the conclusions herein expressed.—*Reversed and remanded.*

WEAVER, C. J., LADD and STEVENS, JJ., concur.