CHARLES N. HARVEY et al., Appellants, v. HENRY C. CLAYTON et al., Appellees.

JUNE 26, 1928.

George J. Dugan and John G. Regan, for appellants.

John A. & W. T. Guiher, Harry Wifvat, White & Clarke, and Ed. R. Brown, for appellees.

KINDIG, J.—J. H. Clayton was the ancestral owner of the real estate in controversy. On and before the 11th day of November, 1884, he was a widower, and the father of one child, Wilda K. Clayton, then approximately 7 years of age. So, on said 11th day of November, Mr. Clayton, just named, executed a will, the substance of which is as follows:

"1. * * * [direction to the executors concerning payment of debts].

"2. I give and bequeath unto my only child, Wilda K. Clayton [the daughter above referred to] the proceeds of sale of all my personal property, including one span of horses, two set of double harness, one sulky plow, one cultivator, and a one-half interest in an old champion mower, hay rake, and fanning mill and coon pelt robe. Also all of my household goods; including beds and bedding and dishes or any other personal property, known to belong to me, including notes and accounts, I also devise unto the said Wilda K. Clayton, all my real estate situated and described as follows: viz: The SE¼ of the NE¼ of Section 34, and West ½ of NW¼ of Section 35, also the SE¼ of the SW¼ Section 26, all in Township 78, Range 27, West 5th P. M. Iowa, to have and to hold all of said above mentioned and described property, until her death. If at the death of said Wilda K. Clayton she should be without living issue, and under twenty-one years of age, I would further bequeath and devise all in effects both personal and real remaining revert back equally between my brothers and sisters or their heirs.

"3. I hereby nominate and appoint Harry Gutshall, as my executor, and request that Abraham Golden be appointed guardian of my heir and only child Wilda K. Clayton, the said Abraham to use his best judgment as to her best interest and welfare."

Afterwards, the testator, J. H. Clayton, without remarrying, died, seized of the property named in the will, which is the subject-matter of this litigation. He was survived, however, by his daughter, Wilda. In the due course of events, the quoted instrument was admitted to probate in the district court in and for Dallas County, on or about the 2d day of September, 1885. According to the nomination in the testament, Harry Gutshall was appointed executor, duly and timely qualified as such, made his final report, which was approved, and was ultimately discharged, October 16, 1886, after full execution of the trust.

Wilda K. Clayton, the daughter, did not die before reaching the age of twenty-one years, but, on the other hand, she lived many years thereafter, and intermarried with one James V. Harvey, to which union six children were born. They are Charles N. Harvey, Hie P. Harvey, J. W. Harvey, Ethel Mae Harvey, Walter Harvey, and Rebecca Harvey, of the appellants. Meanwhile, disposition was made of the 160 acres designated in the J. H. Clayton will, by Wilda K. Harvey (neé Wilda K. Clayton) and her husband, James V. Harvey, by warranty deed, for valuable consideration, so that the appellees are the deed or mortgage grantees, directly or indirectly, from these original and common grantors.

Sometime during the year 1926, Wilda K. Harvey (neé Clayton) died. Therefore, it is to be seen that the dispute here is between the surviving children of Wilda K. Harvey (née Clayton), on the one hand, and on the other, those claiming through conveyances made by her during her lifetime.

Basis for appellants' demand is the will of J. H. Clayton, on the theory that the devisee, Wilda, took a life estate only, and they, her children, under the doctrine of implication, were entitled to the remainder thereafter. As opposed to this is the contention of appellees that appellants are confronted with a dilemma, either horn of which is fatal to their cause. To elucidate, appellees assert: First, that the fee by "implication" under the will went to Wilda, the mother, rather than appellants, her children; or second, if that is not true, then the testator died intestate, so far as the remainder is concerned, in which event it was inherited, through the laws of descent, by his only heir, Wilda, the mother of appellants. Hence, she having disposed thereof by deed during her lifetime, after thus acquiring

and while still holding the entire fee, there is no interest therein remaining now, after her death, for appellants.

The trial court held that the answer presented by appellees, as defendants, stated a good defense to plaintiffs' petition, because: First, the will devised a life estate to Wilda; and second, she acquired the remainder as an intestate inheritance from her father, because she reached the age of twenty-one years. Accordingly, judgment was éntered. About this appellants complain. Such is the problem demanding our solution.

I.   At the outset, appellants maintain that Wilda acquired, through her father's will, a life estate only, and in no event and under no circumstances did she receive the remainder. Replying to this argument, appellees concede that she received at least "the life estate," but insist that, in addition thereto, she took the remainder, either by devise or distribution.

Many general rules of construction are submitted by both appellees and appellants for our guide and direction in the case at bar. Those standards are useful, as indicating the general direction to be traveled, yet, being in the abstract, rather than the concrete, they are of little aid in reaching particular locations within the broad territory traversed. It is of prime importance that the intent of the testator be ascertained "from the terms of the will" (*Gilmore v. Jenkins*, 129 Iowa 686; *In re Estate of Freeman*, 146 Iowa 38; *Iowa City State Bank v. Pritchard*, 199 Iowa 676; *In re Estate of Beaty,* 172 Iowa 714; *In re Estate of Condon*, 167 Iowa 215; *Olson v. Weber*, 194 Iowa 512; *Spaan v. Anderson*, 115 Iowa 121; *Richards v. Richards*, 155 Iowa 394; *Webb v. Webb*, 130 Iowa 457; *Podaril v. Clark*, 118 Iowa 264; *Steiff v. Seibert,* 128 Iowa 746), "under established and recognized canons of construction" (*Todd v. Stewart*, 199 Iowa 821). This requirement is to be met by taking the instrument by its four corners, and giving each part thereof full consideration. *Bradford v. Martin*, 199 Iowa 250; *Dickerson v. Morse*, 200 Iowa 115.

No two wills are likely to be the same. Consequently, the interpretation of one may be of little aid for defining the testator's intent in another.

II.   Illustrative of this principle is appellants' argument to the effect that:

"A clause which clearly limits the devise to a life estate

will not be enlarged into a fee by the failure to devise the remainder after death."

That, as a general declaration, is no doubt true; but, when specifically applied to the facts of a given case, the text may be too broad. Thus, in the cause at bar, the scope of the quoted doctrine is too wide in its range for specific use in determining the "intent of the testator." A review of the authorities relied upon will reveal this truth. Reference is made to *Criley v. Cassel*, 144 Iowa 685; *Koonz v. Hempy*, 142 Iowa 337; *In re Estate of Proctor*, 95 Iowa 172; *Podaril v. Clark*, 118 Iowa 264; *In re Estate of Condon, supra; Paxton v. Paxton*, 141 Iowa 96; *Steiff v. Seibert*, 128 Iowa 746; *Channell v. Aldinger*, 121 Iowa 297.

Practically all of the testamentary documents involved in those citations contain words making plain the testator's purpose to convey upon the particular devisee a life estate only, without permitting him to take through distribution or devise by implication. Often the remainderman there referred to was definitely named, and when not, the idea was clearly expressed, to the effect that the life tenant was such only, and entitled to obtain no part of the remainder. More particularity in differentiation would serve only to unduly lengthen this opinion, and no useful purpose could be served thereby.

III. Devise of the remainder to appellants by implication must result, they say, because of the presumption against intestacy. Their authorities are *Luers v. Luers*, 145 Iowa 600, and *Ross v. Ayrhart*, 138 Iowa 117. There may well be added to that list *Central Tr. Co. v. Langan*, 197 Iowa 1202, and *Redinbaugh v. Redinbaugh*, 199 Iowa 1053. Yet nothing is contained in those pronouncements which defeats the interpretation placed upon this will by the trial court. Only a mere recognition of the general rule is made in the references.

Concerning the usual application of that doctrine, the text of 28 Ruling Case Law, commencing on page 227, Section 189, and continuing through Section 190, on pages 229 and 230, is:

"When a will is executed, the reasonable and natural presumption is that the testator intends to dispose of his entire estate. There is no presumption of an intention to die intestate as to any part of his estate *when the words used by the testator*

*will clearly carry the whole.* [The italics are ours.] Therefore, in the construction of doubtful clauses in a will, that interpretation is to be adopted, if possible, which avoids a partial intestacy, unless it clearly appears that the testator intended to die intestate as to part of his property. * * * Yet a testator may prefer, in certain contingencies, to be wholly or partially intestate, and the presumption against intestacy will not prevail when the language of the will, fairly construed, is insufficient to carry the whole estate. The presumption does not require the court to make a new will, nor to include in it property not comprehended by its terms, and cannot be invoked to establish a gift against the rules of law declaring the legal meaning of the language in a will. * * * *Furthermore, it should be observed that the rule that a testator is presumed to have intended not to die intestate as to any part of his estate is not of greater force than the rule that an heir is not to be disinherited except by express words or necessary implication.* [The italics are ours.] * * * ''

''The heirs of a testator are favored by the policy of the law, and cannot be disinherited upon mere conjecture; and when the testator intends to disinherit them, he must indicate that intention clearly, either by express words or by necessary implication. * * * A necessary implication is one which results from so strong a probability of intention that an intention contrary to that imputed to the testator cannot be supposed. * * * There is no presumption from the fact that he made a will that the testator meant its construction to be, at all possible points, inconsistent with the statute of distribution. Instead, the law favors that construction of a will which conforms most nearly to the general law of inheritance.''

See 40 Cyc. page 1409, Subsection b, pages 1410, 1411, and 1412; and also *Todd v. Stewart,* supra; *Leighton v. Leighton,* 193 Iowa 1299.

Likewise, in the present conflict, the presumptions named must be given their due significance; and if, in the will before us, J. H. Clayton did not intend to distribute all his estate by devise, we cannot make a new testamentary document for him, and compel him to do that which he did not desire. Moreover, we are confronted at this threshold with the well established ''presumption'' that he did not intend to disinherit his own daughter; and to overcome that inference there must be plain

and unmistakable language.   28 Ruling Case Law 229, Section 190.

However, it is not necessary to rely upon encyclopedias and cases from foreign jurisdictions on this proposition, for our own court has had occasion to discuss the theory in *Anderson v. Wilson*, 155 Iowa 415, wherein we used these apt statements:

"Finally, if we are to indulge in any presumption at all in interpreting the will, it should be done with due regard to that well-established rule that an heir at law shall not be disinherited on the strength of a doubtful construction of a will.   The authorities go even farther than this, and say that an heir is not to be disinherited except by express declaration or devise, or by necessary implication from the testator's language. * * * It is not to be denied that cases may be found seemingly opposed to the conclusion here announced, but, as we have already mentioned, many of them turn upon the application of some statute, and others involve devises of substantially different character. In so far as our views may differ from those expressed in the remaining exceptional cases, we think they are in harmony with the better and the greater weight of the authorities."

IV.   What was the "intention" of J. H. Clayton, as expressed in his will?   Confronting this testator was the future care of the little girl, Wilda.   Her mother was dead, and so her father was doubly anxious to make proper provision for his infant daughter.   Should death overtake the only living parent, the little girl would be an orphan of tender years, unable to care for herself or manage her father's estate.   Wherefore, Mr. Clayton was faced with the difficult task of so placing his earthly possessions that they would serve Wilda's best interests.   Infancy, he thought, would make a guardian necessary; and in that event, the testator was not willing that anyone be selected in that capacity without discrimination, but was careful to do all that could be done beforehand in obtaining a capable, trustworthy, and efficient trustee of that kind.   Resultantly, a nomination was made in the will.   Specific direction was given to this guardian, in that he was told to "use his best judgment as to her [Wilda's] best interest and welfare."

Significance is to be found in the way the testator referred to Wilda regarding this guardianship.   The allusion is "my

heir and only child.'' Manifestly, this father wanted his daughter, Wilda, to have his entire estate, first to be supervised by the guardian named, and finally to be hers absolutely. Doubtless during the years before she became twenty-one, her guardian had a right to appropriate, not only the income, but also the corpus, of the estate, as well, for the maintenance, education, and well-being of the ward. ''Revert'' related only to the real and personal property remaining. Nothing appears in the language of the instrument expressly conferring upon Wilda the right to sell and convey the real or personal property in connection with the life estate, as distinguished from the total ownership thereof in her.

Apparently the father was attempting in every possible way to protect and assist his daughter during her immature years, realizing that there is a period in life when a man or woman is not capable of handling or disposing of his or her property. Difficulty is always presented in fixing a line of demarcation between maturity and immaturity. Much depends upon the individual. Any attempt to draw such distinction, no doubt, is more or less arbitrary. For Wilda, the testator in the case at bar drew the line at twenty-one years. Obviously, he felt that, after reaching that age, his daughter would be capable of managing and disposing of her property as an adult; but before, she would not have the sufficient capacity. Issue, or the absence thereof, was not the criterion, but rather ability; for, after reaching the age limit, the presence or absence of children was not named as a prevention against her free use of the property. With that purpose in view, Mr. Clayton incorporated the contingency to the effect that, if his ''heir and only child'' died before reaching the age of twenty-one, the estate should then be disposed of, not according to her wish, but rather his own.

Then, after reaching the ''arbitrary age of maturity'' fixed in the testament, Wilda had a right to will, convey, or contract away this property as she saw fit; because, in that event, she possessed the ability and capacity so to do, under the father's scheme of determination. Before attaining that age, she owned the property subject to the contingency named in the will; while, after arriving at twenty-one, the uncertainty was removed; and this was so regardless of whether or not Wilda obtained the remainder through devise by implication or the in-

heritance of her father's intestate estate. Express language to be considered is, immediately following the contingency named:

"I would further bequeath and devise all in effects both personal and real remaining revert back."

Conceding that the employment of the words "revert back" may not be absolutely controlling, yet they certainly have some significance in the present consideration. Thus, continuing with this thought in mind, it is appropriate to ask from whom the testator intended the estate to "revert back." Most certainly from Wilda, because the event named contemplates the absence of her issue. Necessarily, then, she is the only person to whom reference could be made. Explanation by appellants is attempted through citing *Stivers v. Gardner*, 88 Iowa 307, holding that, under certain circumstances, "revert" may be used in the same sense as "give" or "devise." Undoubtedly, under proper facts and conditions, that is true; but here the word "revert" could have no possible meaning if it were given that interpretation, due to the fact that "bequeath and devise" are used to convey the subject-matter which is to "revert back." Furthermore, "revert" in the instrument before us is employed with "back." Of necessity, then, the testator was ordering, under the uncertain events named, that the estate which, by implied devise or inheritance, Wilda had received at his death, should "revert back" to him, and then pass on to his brothers and sisters, or their heirs. Carrying out this general plan, the testator did not want to prevent Wilda's issue from taking as her heir, under this theory. Therefore, the contingency was inapplicable if there were such offspring. Had there been no such provision in favor of the testator's brothers and sisters, the property would have descended to Wilda's heirs, including those (if she had no issue) of the mother, as well as the father. Clearly, it was to prevent this that reversion was utilized, and in so doing the testator no doubt was of the belief that he should not handicap Wilda in her free disposal of her inheritance after she reached the age designated.

Whatever significance the use of the word "revert" may have in determining the will of the testator, it is not so important as his plan of dividing Wilda's life into two parts. One disposition of the estate was to be made if she died before reaching the age of twenty-one, while another was to take place if

she lived beyond that specified time. Disposition of the remainder after this life estate must be different in the two periods of Wilda's life. Otherwise, the use of the word "twenty-one years" was entirely useless, and of no effect. But in arriving at the testator's "intention," it is necessary to give meaning to all the language used by him; and consequently these words cannot be construed as a mere nullity.

The testator's brothers and sisters were to have the estate named in the contingency if Wilda died before reaching twenty-one years of age without issue. That must indicate, then, that these brothers and sisters were not to have this property if Wilda died without issue after she arrived at that age. Logic compels this. Were it not so, there would have been absolutely no need for the age specification. And in order to give the brothers and sisters anything after Wilda had become twenty-one years, it is necessary to entirely exclude that reference to her maturity. If, therefore, the use of the words "twenty-one years" gave the brothers and sisters something in one event, and nothing in the other, why is it not true also that Wilda's issue was provided for in the one instance, and not in the other? Necessarily, the line of demarcation which divides the first years of Wilda's life from the latter, so far as the brothers and sisters are concerned, likewise distinguishes, under the testator's outline, with regard to her issue's rights to take the property. Hence, if the brothers and sisters of the testator or the issue of Wilda obtained this property, it was in the event only that the latter died before reaching the age of twenty-one; because thereafter the testator put into effect another scheme of operation, which, due to its very difference from the first, amounted to a preclusion and exclusion thereof. He thought, after arriving at that age, Wilda would have the ability and capacity to dispose of her earthly possessions rationally and sensibly, even though she may have been unable to have done so before.

Appellants were not specifically named as devisees of the remainder after the life estate. So, without express words of disinheritance or appropriate language giving rise to an implication to that effect, Wilda cannot be said to have been slighted, so far as said remainder is concerned. Especially is this true when, after making all the bequests and devises contained in the will, she is still referred to by the testator as "my heir."

V. We are at all times to indulge in the presumption that the testator knows the law and understands and appreciates the effect of the language used by him in his will. See *In re Will Kielsmark*, 188 Iowa 1378.

Plainly, after giving effect to the theories applicable, and carefully reading the testamentary instrument throughout, we are constrained to hold that the district court was right in deciding that appellants were not entitled to the property in question.

VI. Because of the disposition already made of this litigation, it becomes quite immaterial through which theory Wilda obtained her title. Appellants concede the doctrine of devise by implication, under proper facts. In truth, they sought to invoke it here; and more than this, we understand that they too admit that there may, on certain occasions, arise a partial devise and partial intestacy.

Harmonious with this concession are the following decisions: *Podaril v. Clark*, supra; *Paxton v. Paxton*, supra; *Leighton v. Leighton*, supra; and *Gilmore v. Jenkins*, supra. *Leighton v. Leighton*, supra, contains this apt language:

"As to the intestate property, of course, it descends as though there was no will."

*Podaril v. Clark*, supra, likewise suggests:

" * * * but under this will [the one discussed in the case], the remainder, being undisposed of, passes at once to the heirs at law * * * ."

Then it is enough for us to say that the appellees obtained their various titles claimed through Wilda, the daughter of J. H. Clayton, the original owner, and it is not necessary to, and we do not, decide whether this came about through devise by implication or the descent of an intestate estate.

We must, therefore, and do hereby, affirm the judgment of the district court.—*Affirmed*.

STEVENS, C. J., and EVANS, FAVILLE, and WAGNER, JJ., concur.