Jacob Rahn died testate in Carroll County, Missouri, on February 24, 1920. He was a bachelor and a citizen of the United States and, prior to his death, resided on a farm near the town of Dewitt in Carroll County. His last will and testament is dated and attested on February 8, 1916. By the second item or paragraph of his will, the testator made the following bequest:
"Second. I here will and bequeath the sum of ten thousand dollars ($10,000), to be paid in the manner hereinafter stated, to the German Red Cross Society, of the Empire of Germany, in Europe, without any bond or security from said Red Cross Society, all of said amount is to be by said German Red Cross Society received and by it applied and paid out for the then immediate relief, use and benefit of the then widows, orphans, and invalids, objects of charity under the then care and charge of said German Red Cross Society, aforesaid, resulting from the war now going on in Europe; the full amount of said bequest last aforesaid is to be by my executor hereinafter named (or his successor in office) paid over at the expiration of one year after the date of my death (or as soon after said one year as assets therefor may be available) to the then person acting in the accredited official capacity as Imperial German Consul, of Germany (or his accredited official successor in said official capacity) at St. Louis, State of Missouri, United States of America, without any security or bond from said Imperial German Consul (or his said successor as aforesaid) to the use and to be by said Imperial German Consul (or his said successor) paid in full amount over to said German Red Cross Society aforesaid, for the purposes aforesaid; and the receipt or receipts of said accredited Imperial German Consul (or his said official successor as aforesaid) to my said executor (or his successor in office) shall be a full acquittance and discharge to *Page 497 
my said executor or his successor, for all amounts so paid by him as aforesaid, without question or dispute, and my said executor shall receive credit on his settlement of my estate for all amounts so paid hereunder, without question or dispute."
The will was duly proved and admitted to probate in the Probate Court of Carroll County on March 2, 1920, and letters testamentary were granted to respondent, Robert G. Martin, the executor nominated in the will, who qualified as executor on March 2, 1920. On May 4, 1922, Hugo Mundt, the duly appointed, qualified and acting Consul of Germany at St. Louis, Missouri, filed in the Probate Court of Carroll County his petition for an order of distribution in the estate of Jacob Rahn, deceased, praying that court to make and enter an order directing the executor of said estate to pay over and distribute said legacy of $10,000, together with interest thereon from February 24, 1921 (said date being one year after the death of testator), to petitioner in his official capacity as the Consul of Germany at St. Louis, Missouri, in accordance with item two of testator's will. On December 22, 1922, the Probate Court of Carroll County made and entered an order in said estate, directing the said executor to make partial distribution of assets of said estate by paying over and distributing to said Hugo Mundt, petitioner, the legacy of $10,000 provided by item two of testator's will, together with six per cent interest thereon from June 26, 1922, the date when said Hugo Mundt was recognized and accredited by the United States Government as the duly appointed Consul of Germany at St. Louis, and that said executor take and receive credit therefor in his settlement of said estate, after deducting from said bequest the inheritance tax assessed and levied against said bequest in favor of the State of Missouri, with interest thereon, in the aggregate sum of $528.38, which had been paid to the State by said executor on February 5, 1921. In due time, respondent, Robert G. Martin, as executor of said estate, appealed from the order and judgment of distribution made and entered by said probate court to the Circuit Court of Carroll County, where the proceeding was tried anew.
The proceeding was tried and submitted in the Circuit Court of Carroll County on September 21, 1923, upon an agreed statement of facts, setting out in haec verba the last will of Jacob Rahn, deceased, the date of probate thereof, the appointment of respondent executor, and that said executor has sufficient money on hand to pay off and distribute the legacy provided by item two of said will, but that no part of said legacy has been paid. The agreed statement further stipulates as facts agreed upon by the parties that "on the 6th day of April, 1917, a state of war was declared to exist by the Congress of the United States of America between the United States of America and the Empire of Germany in Europe, and that said state of *Page 498 
war existed between said United States and said German Empire until the 2nd day of July, 1921, said date being the date designated by the President of the United States in his proclamation of date the 14th day of November, 1921, as the date of the ending of the war between the United States of America and Germany; and it is further agreed that an armistice was signed and entered into between the United States of America and the said German Empire, and the other allied and associated powers engaged in said war, on the 11th day of November, 1918. It is further stipulated and agreed that Hugo Mundt is now the accredited official German Consul of Germany located at the city of St. Louis in the State of Missouri, in the United States of America, he having been recognized as such by the Government of the United States on the 26th day of June, 1922, and it is further agreed that the Empire of Germany had no accredited German Consul at the City of St. Louis, Missouri, after April 6, 1917, until the 26th day of June, 1922.
"It is further stipulated and agreed that at the time of the death of the said Jacob Rahn, the Red Cross service in Germany was carried on by and through individual Red Cross Societies in the various states composing the German Empire, and that these separate state organizations in matters of national concern operated through a committee known as the Central Committee of the German Society of the Red Cross, for the following purposes:
"1. To perfect and strengthen by their activity and means the arrangements for personnel and material suitable for taking in charge, nursing and treating the wounded and sick, on the field of battle in case of war.
"2. To support with all powers and means at their disposal, the military sanitary service in case of war.
"3. Also after the conclusion of peace to grant aid to such needy participants in the war who in consequence of the war were injured in their health and thereby impaired in their earning capacity, as well as their surviving dependents so far as they do not already receive sufficient assistance from the Empire or other sources."
"It is further stipulated and agreed that the said Central Committee continued in existence until the 21st day of November, 1922, when it was succeeded by an organization incorporated under the name of Das Deutsche Rote Kreuz (The German Red Cross), which is in existence at this time, under the Red Cross Treaty to which the United States is a party."
On November 3, 1923, the Circuit Court of Carroll County entered its judgment and decree, wherein that court finds that "the bequest in the second item of the will of Jacob Rahn, deceased, is void as against public policy and that the bequest should not be paid as provided for in said item of said will." Wherefore, it was "adjudged *Page 499 
and decreed by the court that the petitioner, Hugo Mundt, plaintiff herein, take nothing by his petition, and that the judgment of the court should be and is hereby rendered for the defendant, Robert G. Martin, executor of the estate of Jacob Rahn, deceased; and it is further adjudged and decreed that the said defendant executor have and recover of said plaintiff his costs."
In due time, the petitioner, Hugo Mundt, filed his separate motions for new trial and in arrest of judgment, which were overruled by the trial court, and said petitioner was granted an appeal to this court. Subsequently, by agreement of the parties, Rudolph Steinbach, German Consul General at Chicago, Illinois, was substituted as party plaintiff herein, in the place and stead of Hugo Mundt, Consul of Germany at St. Louis, Missouri. On April 27, 1926, the parties filed in this court their signed stipulation, wherein it is agreed that George Ahrens, German Consul at St. Louis, Missouri, may be substituted as party plaintiff in the place and stead of Rudolph Steinbach, German Consul General at Chicago, Illinois, so that said George Ahrens thereby becomes the party appellant in this court.
Appellant assigns error, asserting that the finding of the circuit court is against the evidence and the weight of the evidence, and against the law as applied to the evidence and to the agreed statement of facts upon which the proceeding was submitted to the circuit court for decision; and, furthermore, that the circuit court erred in finding and ruling that the bequest provided by the second item of testator's will is void as against public policy. Respondent contends here that said bequest is void and has failed for the following reasons: (1) Because said bequest is against public policy, the bequest being in aid of the fighting forces (or their dependents) of an enemy of our nation in the late World War; (2) because there are no beneficiaries of the bequest capable of taking, and because the trustee named therein to receive and administer the bequest is not and never has been a legal entity or in existence; and (3) because the bequest shows plainly the intent of the testator to give only immediate relief to a certain specified class under the charge or administration of a specific organization, which intent cannot be carried out and therefore fails of accomplishment. We will discuss and rule the respective contentions of the parties in their order.
I. Inasmuch as the finding of the circuit court is that "the bequest in the second item of the will of Jacob Rahn, deceased, is void as against public policy," and inasmuch as the respondent executor contends in this court that said bequest is against public policy, we might well consider what isPublic the definition, and what are the sources, of "publicPolicy. policy," as that term or expression is used in our system of jurisprudence. *Page 500 
In Gordon v. Gordon's Admr., 168 Ky. 409, 412, it is said: "It is probable that a satisfactory or precise definition of public policy has never been given. The courts have, however, frequently approved Lord Brougham's definition of public policy, as the principle which declares that no one can lawfully do that which has a tendency to be injurious to the public welfare." The term has been said, in Billingsley v. Clelland, 41 W. Va. 234, 244, to be equivalent to the expression, "the policy of the law." In Johnston v. Chicago Great Western Railroad Co., 164 S.W. 260, l.c. 262 (K.C.C.A.), it is said: "The term `policy of the law' or `public policy' is difficult to define, but for present purposes we shall think of it as referring to the purpose and spirit of the substantive laws of a state whether such laws be found in the Constitution and statutes or in judicial records." This court, in State ex rel. v. Dirckx, 211 Mo. l.c. 580, has said: "It has been said by courts of great ability, `When we speak of the public policy of the State we mean the law of the State, whether found in the Constitution, the statute or judicial records.' [People v. Hawkins, 157 N.Y. l.c. 12; Vidal v. Girard's Exrs., 2 How. (U.S.) 127; Dammert v. Osborn, 140 N.Y. l.c. 40.]"
Respecting the sources of public policy, it is aptly said in Swann v. Swann, 21 Fed. l.c. 301: "Vague surmises and flippant assertions as to what is the public policy of the State, or what would be shocking to the moral sense of its people, are not to be indulged in. The law points out the sources of information towhich courts must appeal to determine the public policy of aState. The term, as it is often popularly used and defined, makes it an unknown and variable quantity — much too indefinite and uncertain to be made the foundation of a judgment. The onlyauthentic and admissible evidence of the public policy of a stateon any given subject are its constitution, laws and judicialdecisions. The public policy of a state, of which courts takenotice, and to which they give effect, must be duduced from thesesources." (Italics ours.)
In Hartford Fire Insurance Company v. Railway Co., 70 F. 201, 202 (C.C.A., 8th Cir.), Judge SANBORN, speaking for that court, said: "The public policy of a State or Nation must be determined by its constitution, laws and judicial decisions; not by the varying opinions of laymen, lawyers or judges as to the demands of the interests of the public."
The Federal Supreme Court has said, in United States v. Trans-Missouri Freight Assn., 166 U.S. 290, 340: "The public policy of the Government is to be found in its statutes, and when they have not directly spoken, then in the decisions of the courts and the constant practice of the government officials."
The same court has said, in Hartford Fire Ins. Co. v. Railway Co., 175 U.S. l.c. 100: "Questions of public policy, as affecting the *Page 501 
liability for acts done, or upon contracts made and to be performed, within one of the States of the Union — when not controlled by the Constitution, laws or treaties of the United States, or by the principles of the commercial or mercantile law or of general jurisprudence, of national or universal application — are governed by the law of the State, as expressed in its own constitution and statutes, or declared by its highest court."
So it has been held by the appellate courts of our own State that "the very highest evidence of the public policy of any State is its statutory law and, if there is legislation on the subject, the public policy of the State must be derived from such legislation." [Moorshead v. Railways Co., 203 Mo. 121, l.c. 165; Blanchard Co. v. Hamblin, 162 Mo. App. 242, 251.] Judge NAPTON, speaking for this court, in State v. Clarke, 54 Mo. 17, l.c. 36, aptly remarked: "It is a naked assumption to say that any matter allowed by the Legislature is against public policy. The best indication of public policy is to be found in the enactments of our Legislature."
It seems clear to us, therefore, from the great weight of judicial authority, that no act or transaction should be held to be void as against public policy unless it contravenes some positive, well-defined expression of the settled will of the people of the State or Nation, as an organized body politic, which expression must be looked for and found in the Constitution, statutes, or judicial decisions of the State or Nation, and not in the varying personal opinions and whims of judges or courts, charged with the interpretation and declaration of the established law, as to what they, themselves, believe to be the demands or interests of the public. So it necessarily follows that courts should exercise extreme caution in declaring any act or transaction void as against public policy, unless it clearly appears that the transaction contravenes the Constitution, some positive statute, or some well-established rule of law announced by the judicial decisions, of the State or Nation.
The Springfield Court of Appeals, in Montgomery v. Montgomery, 142 Mo. App. l.c. 487, quotes with approval the following statement of the rule from Smith v. DuBose, 78 Ga. 413: "Judicial tribunals hold themselves bound to the observance of rules of extreme caution when invoked to declare a transaction void on grounds of public policy, and prejudice to the public interest must clearly appear before the court would be warranted in pronouncing a transaction void on this account. It is said that the power of courts to declare a contract void for being in contravention of sound public policy is a very delicate and undefined power, and, like the power to declare a statute unconstitutional, should be exercised only in cases free from doubt."
The province of the judiciary respecting the declaration of what is, or is not, for the public weal is well expressed by Baron PARKE, *Page 502 
in Egerton v. Brownlow, 23 L.J. Ch. (New Series) 348, 370 (Eng.): "It is the province of the statesman, and not the lawyer, to discuss, and of the legislature to determine, what is the best for the public good, and to provide for it by proper enactments. It is the province of the judge to expound the law only — the written from the statute, the unwritten or common law from the decisions of our predecessors and of our existing courts — from the text-writers of acknowledged authority, and upon the principles to be clearly deduced from them by sound reason and just inference; not to speculate upon what is the best, in his opinion, for the advantage of the community. Some of these decisions may have no doubt been founded upon the prevailing and just opinions of the public good . . .; they have become a part of the recognized law, and we are, therefore, bound by them, but we are not thereby authorized to establish as law everything which we may think for the public good, and prohibit everything which we think otherwise."
The foregoing language of Baron PARKE is quoted with approval by the Lord Chancellor of England in Janson v. Consolidated Mines, 71 L.J., King's Bench Div. (New Series) 857, l.c. 863, whereupon the learned Lord Chancellor further remarked: "It is not necessary to go through all the principles of law which may make a contract altogether illegal. . . . They are defined legal principles, known to and absolutely fixed as part of our law, and a judge is called upon to bring the instrument he has to construe to the test whether it is or is not within such principles; but I do not think he has any jurisdiction to bring into the discussion his own views of what he may consider an inexpedient thing in his own peculiar view of public policy. To permit such a discussion to arise it must be a question of some public policy recognized by the law."
So it is clearly apparent, from the foregoing decisions, that it is not the function of the judiciary to create or announce a public policy of its own, but solely to determine and declare what is the public policy of the State or Nation as such policy is found to be expressed in the Constitution, statutes and judicial decisions of the State or Nation.
II. Bearing in mind, therefore, the foregoing principles respecting the sources from which the public policy of our State and Nation is to be ascertained and the proper scope of our judicial power in declaring such public policy, when properly ascertained, can we say that the testator's bequest,Request to as made in the second item of his will, contravenesEnemy public policy as expressed and found in theAlien. Constitution, statutes and judicial decisions of this State and of our Nation? We may say, at the outset, that the policy of the law favors freedom in the testamentary *Page 503 
disposition of property and that it is the duty of the courts to give effect to the intention of the testator, as expressed in his will, provided such intention does not contravene an established rule of law. The rule is thus clearly expressed by Mr. Chief Justice MARSHALL, in Smith v. Bell, 6 Pet. (U.S.) 68, 75: "The intention of the testator, expressed in his will, shall prevail, provided it be consistent with the rules of law. . . . These intentions are to be collected from his words, and ought to be carried into effect if they be consistent with law."
Our attention has not been directed by respondent to any statute of this State which indicates, in the slightest degree, that the public policy of this State is opposed to the transfer of personal property by will to an alien, whether such alien be friend or enemy. Our statute dealing with the rights of aliens (Secs. 590 to 594, Chap. 2, R.S. 1919) contains no inhibition against the transfer of personal property to an alien by will, or against the taking of personal property by an alien when bequeathed by will. The judicial decisions of this State, which reflect our public policy, seem to favor the right of an alien to take personal property, whether such taking be by will or by inheritance. In the early case of Greenia v. Greenia, 14 Mo. 526. it was ruled that an alien is not barred from taking personal property by descent or inheritance, and in Harney v. Donohoe,97 Mo. 141, it was announced that there is nothing in the statutes or the common law in force in this State which prevents non-resident aliens from taking personal property as distributees. So far as we know, the propriety, or correctness, of those decisions has never been questioned.
Nor has respondent called our attention to any act of our national Congress which inhibits the making of a testamentary bequest to an alien, either friend or enemy, or which inhibits the taking of personal property under will by such alien, unless it be the "Trading with the Enemy Act" of October 6, 1917. [U.S. Com. Stat. 1918, secs. 3115½a — 3115½j.] Commenting upon the purposes of that act, Mr. Huberich, in his treatise on The Law Relating to Trading with the Enemy, page 46. says: "From the language employed in the act as well as from the evident intent of the framers of the bill and the legislative debates, the general purposes of the act, in so far as the act relates to the trade with and the property of enemies, are the following: 1. To interdict all intercourse, commercial or non-commercial, with all persons who are enemies or allies of enemy within the meaning of the act, and to prohibit the doing of acts tending to the financial benefit of such persons. 2. To leave unaffected the property and other civil rights of resident alien enemies, including corporations organized under the laws of any State of the United States, whose stockholders are wholly or in part alien enemies. 3. To conserve *Page 504 
and protect through governmental agencies, and not to confiscate, the tangible and intangible property of non-residentalien enemies, in such manner, however, that such property may not be used as the basis of credit in foreign countries by the enemy owner. 4. To leave in force the common-law provisionsregarding the effect of war on contracts, Statutes of Limitation, rights to devises and bequests, and rights as parties to actions, except in so far as the act mitigates the right of the common law. 5. To provide for a liberal system of licensing transactions within the letter, but not within the spirit of the act." (Italics ours.)
The same text-writer (Huberich on Trading with the Enemy, p. 120) furthermore states the proposition: "It is unquestioned that a bequest of personal property to an alien enemy is good at common law and may be enforced after peace. [Attorney-General v. Wheeden (1699), Park. 267, cited with approval in Fairfax v. Hunter (1813), 7 Cranch (U.S.) 603, 3 L.Ed. 453.] As Chancellor Kent says in Bradwell v. Weeks (1814), 1 John. Ch. (N.Y.) 206: `They (the existing laws) impose no forfeiture or confiscation of property, they destroy no right, but only suspend the exercise of certain rights. It is for the sovereign power of the country to determine when, and how far, in cases unprovided for by treaty, the rights and property of alien enemies shall be impaired by war. Without some special act of the government, an alien enemy is not otherwise affected in his former capacity, as alien friend, to hold, acquire and transmit property.'"
Looking to the judicial decisions of other jurisdictions, we find nothing therein indicating that the public policy of our sister States or of the Nation is inimical to the testamentary disposition of personal property to an alien enemy. One of the leading cases dealing with the subject in hand is the recent case, In re Kielsmark's Will, 188 Iowa 1378, 177 N.W. 690, ruled by the Supreme Court of Iowa on May 15, 1920, wherein the testatrix, a citizen of the United States, had devised certain real estate and bequeathed certain personal property to two nieces, who were residents and citizens of Germany. The will was made and probated, immediately upon the death of testatrix, while a state of war existed between this Nation and the Imperial Government of Germany. Certain heirs of testatrix, residents of the United States, filed objections to the probate of the will, predicating such objections on the ground that the beneficiaries named in the will were and are alien enemies and claiming that the devise and bequest are absolutely void upon such ground. Said that court, in ruling the question: "We do not find that it has ever been expressly held that the law of nations, as judicially declared, renders void a devise made to an alien enemy. We do not find it so held in direct terms, and we think there is reason for distinguishing the *Page 505 
act of devising property to an alien from those transactions heretofore held void, especially when the devise relates to real estate. Nothing passes to the enemy at the time of the making of the will. The making of the will involves no personal transaction between the devisee and testator. Nothing passes at that time, nor can anything pass until the death of the testator. On the probate of the will, an executor is appointed, who serves as custodian of all the property, under the direction of the court. No action can be maintained by the alien to recover the property, or the increment of the property, while a state of war exists, and he acquires no dominion over it either for use or service. A bequest by one relative to another, though the other be an alien enemy, does not even remotely suggest a purpose to give aid or comfort to the alien enemy, and does not, and in the nature of things cannot, tend to increase his resources. . . . It will be borne in mind that Anna Kielsmark [testatrix] was a resident and a citizen of the United States; that she was the owner of the property, and acquired and held such ownership under the laws of the United States; that she had a right to convey and dispose of this property as she saw fit; that she had a right to bequeath it to aliens, and aliens had a right to take it under the bequest. The only question legitimately presented to the court was whether or not the instrument was the last will and testament of Anna Kielsmark, executed in conformity with the, laws of this State, and whether or not she had testamentary capacity, at the time, to make the will. The effect of the will, when executed, presented an entirely different question; but the parties, waiving the form in which the question was raised, have presented to us the sole question whether or not, when properly probated, the instrument is effectual as a devise of property within this State, and whether or not the interdiction of public law, based upon public policy, or the act of Congress (against trading with the enemy), hereinbefore referred to, makes it void. We cannot construe the making of a will as within the inhibition of either the general law or the act of Congress. It certainly is not an act of trading, nor can it be legitimately brought within any of the definitions of trading, as made by the act itself."
It was held by the Supreme Court of Pennsylvania, In re Gregg's Estate, 266 Pa. 189, 109 A. 777, that, although a testatrix died after war had been declared between the United States and the German Empire, and while the Trading with the Enemy Act was in force, a devise and bequest of one-third of testatrix's estate to a daughter, who was an alien enemy, was not void so that the property would pass to the residuary legatees and devisees.
In re Roeck's Estate, 195 N.Y.S. 505, it was ruled in surrogate's court that the right of a citizen of the United States to bequeath personal property to a citizen of Germany before the war *Page 506 
was not abridged by the declaration of war, nor did the bequest violate the Trading with the Enemy Act by becoming operative during the war. Said SCHULZ, S., in that case: "The question presented, therefore, is whether these enemy aliens, residing in the country of the enemy at the time of the death of the decedent, may, under our laws, take the legacies of personalty made to them, or whether, as to such legacies, the decedent died intestate, and the amounts bequeathed are distributable to the contestants as the widow and next of kin of the decedent. . . . It is urged that there is no question of confiscation involved in this matter, but only of a refusal to permit an alien enemy, if resident in the enemy country, to take by bequest. If the governmental policy, however, is not to deprive such enemy aliens of property actually owned by them before the war begins, it seems logical to assume that the same policy exists as to rights which had been granted and which existed prior to the war, and of these the right to take by bequest was one. [Meakings v. Cromwell, 5 N.Y. 136; Beck v. McGillis, 9 Barb. 35; Marx v. McGlynn, 88 N.Y. 358.] Again, before the war, the decedent, a citizen of this country, was privileged under our laws to make the bequest stated, and the same would have been valid and enforceable if he had died before the war. These rights are not abridged simply by the declaration of war itself, because the settled policy of the Government is to impair as little as possible the private rights of citizens by national differences. [Sands v. New York Life Ins. Co., 50 N.Y. 626; Brown v. United States, 8 Cranch, 110.] Nor did the fact that the bequest became operative during the war violate the Trading with the Enemy Act. [In re Kielsmark's Will, 188 Iowa 1378; In re Gregg's Estate,266 Pa. 189.] If, therefore, these rights have been taken away during the war, we must look for some statute so providing, and, if there is none, for some adjudication which has established such to be the law, and hence has the force of a statute to that effect."
A somewhat similar question was before the Supreme Court of the United States in Corbett v. Nutt, 77 U.S. 464. A testatrix died in April, 1863, seized of a tract of land in the State of Virginia, leaving a last will and testament, by which she devised said land to one Nutt in trust for an adopted daughter and a niece. Prior to the Civil War, the testatrix resided in Alexandria County, Virginia, but after the occupation of Alexandria by the forces of the United States, she went within the Confederate lines, and there remained until her death. In July, 1862, the Congress of the United States enacted an act having for its object "the speedy termination of the present rebellion." By a section of that act it was provided that if any person engaged in armed rebellion against the United States, or aiding or abetting such rebellion, shall not, within sixty *Page 507 
days after warning and proclamation of the President of the United States, cease to aid, countenance and abet such rebellion, and return to allegiance to the United States, all the estate and property of such person shall be liable to seizure by the United States Government, and it was further provided that "all sales,transfers, or conveyances of any such property after the expiration of the said sixty days from the date of such warning and proclamation, shall be null and void." It was urged that the devise of testatrix was void as being in contravention of the language and spirit of the act. Mr. Justice FIELD, delivering the opinion of the court, said, in ruling the question, l.c. 479: "If the devise of Mrs. Hunter [testatrix] can be brought within the language of this last section, it must be because a devise is embraced within the terms `sales, transfers, and conveyances;' and because her `aiding and abetting' the rebellion, and her refusal to return to her allegiance to the United States, are legitimate and necessary inferences from her voluntary and continued residence within the Confederate lines, for there is no direct evidence on either of these latter points, nor any evidence tending to establish either of them except such voluntary residence. Assuming, however, that a devise is within the `sales, transfers, and conveyances' invalidated by the act, and that Mrs. Hunter is within the category of persons for whom the warning and proclamation of the President were intended, we are of the opinion that the invalidity declared is limited and not absolute; that it is only as against the United States that the `sales, transfers, and conveyances' of property liable to seizure are null and void; and that they are not void as between private persons, or against any other party than the United States. The object of the provisions cited is manifest. It is declared, in express terms, to insure the speedy termination of the existing rebellion. . . . It was to prevent these provisions from being evaded by the parties whose property was liable to seizure that `sales, transfers, and conveyances' of the property were declared invalid. They were null and void as against the belligerent or sovereign right of the United States to appropriate and use the property for the purpose designated, but in no other respect, and not as against any other party. Neither the object sought, nor the language of the act, requires any greater extension of the terms used. The United States were the only party who could institute the proceedings for condemnation; the offence for which such condemnation was decreed was against the United States, and the property condemned, or its proceeds, went to their sole use. They alone could, therefore, be affected by the sales. Any other construction would impute to the United States a severity in their legislation entirely foreign to their history."
Respondent cites Carson v. Hunter, 46 Mo. 467, and Peltz v. Long, 40 Mo. 532, as announcing the public policy of this State with reference *Page 508 
to transactions which aid an enemy of our common country. Both cases are readily distinguishable, in our minds, from the instant proceeding. The Carson case was an action brought by plaintiff upon a promissory note given by defendant in consideration of the sale of negro slaves, taken by plaintiff from Missouri to Arkansas during the Civil War, and sold to defendant. Defendant pleaded the illegality of the consideration and invoked the Act of Congress of July 13, 1861, which forbade all commercial intercourse between the States declared to be in insurrection, and their citizens, and the citizens of the United States. Under authority of the act, the President of the United States declared certain States, including Arkansas, to be in insurrection, and all trade between citizens of Missouri and citizens of Arkansas became unlawful unless by special license. It was held that, if plaintiff took negroes, or any other property which was the subject of barter and sale, from Missouri into Arkansas and sold them, and received the note in suit in payment, the transaction was in violation of law and the note was therefore uncollectible. The Peltz case was an action upon a promissory note which was given in consideration for Confederate money issued by authority of the States in rebellion. It was ruled that the note was given for an illegal consideration and was therefore void.
We cannot view the testamentary bequest in question as violative, or in contravention, of the recent Trading with the Enemy Act of Congress or as violative of the spirit and purposes of that act. The act itself, in specific terms, defines the meaning of the words "to trade," as used therein (U.S. Comp. Stat. 1918, sec. 3115½aa), and by no stretch of the imagination or liberality of construction can the bequest of testator be legitimately brought within the scope or intendment of that act.
But respondent contends that the bequest is void as against public policy because the beneficiaries thereof were part of the fighting forces (or their dependents) of the enemy of the United States in the late war. It is insisted that, inasmuch as the language of the bequest makes clear the intent of the testator that the sum bequeathed is to be "applied and paid out for the then immediate relief, use and benefit of the then widows, orphans, and invalids, objects of charity under the then care and charge of said German Red Cross Society, aforesaid, resultingfrom the war now going on in Europe," and inasmuch as the late war between our Nation and Germany did not officially terminate until July 2, 1921, more than a year after the death of testator, the effect of the testamentary bequest is to give "aid and comfort" to the enemy in contravention of Section 3 of Article 3 of the Federal Constitution and Section 13 of Article 2 of our State Constitution, and hence is opposed to the *Page 509 
policy of the law as expressed in the Constitutions of our State and Nation.
Respondent would have us draw a distinction herein between testamentary gifts from a testator to relatives who are alien enemies, which gifts, are prompted by the motive of affection or the tie of blood, and gifts which are intended to relieve the suffering of widows and orphans of enemy soldiers who were combatants in the war and enemy soldiers who were invalided as a direct result of the war. But it must be borne in mind that the will speaks from the death of the testator, which occurred on February 24, 1920. The Armistice was signed and entered into between the United States and Germany on November 11, 1918, at which time actual warfare and open hostilities between the two nations ceased. While it is true that peace between our Nation and Germany was not officially declared to be effective until July 2, 1921, nevertheless, although residents and citizens of Germany may technically be termed enemies of this Nation until the official declaration of peace, yet, after the signing of the armistice, such aliens were technical rather than de facto
enemies. In Driefontein Consolidated Gold Mines, Ltd. v. Janson (1901), 2 K.B. (Eng.) 419, SMITH, Master of the Rolls, after stating the general public policy of Great Britain to be "that it is against the interests of this country that a subject of this country when at war should relieve an enemy of this country against the calamities of war," remarked: "In my judgment, `enemy,' as regards the application of this public policy, means a real de facto enemy, and not a mere possible technical enemy."
In Daimler Company v. Continental Tyre Rubber Company, Ann. Cases, 1917 C, l.c. 185, Lord PARKER, speaking for the House of Lords of England, said: "It was suggested in argument that acts otherwise lawful might be rendered unlawful by the fact that they might tend to the enrichment of the enemy when the war was over. I entirely dissent from this view. . . . The prohibition against doing anything for the benefit of an enemy contemplates his benefit during the war and not the possible advantage he may gain when peace comes."
It seems plain to us that neither the purpose nor the effect of testator's bequest was to give "aid and comfort" to the enemy. Under the express terms of the bequest, payment thereof is to be made to the person then acting in the accredited official capacity as Consul of Germany at St. Louis, Missouri, or to his accredited official successor. Of course, there could be no such person until after the war with Germany was officially terminated and peace was restored and until diplomatic relations between that country and the United States were re-established. Consequently, no alien enemy of the United States could have received any benefit, aid or comfort from *Page 510 
the bequest during the period of war. In fact, the precise language of the bequest would indicate the fixed intention of testator that the beneficiaries should not receive the benefit thereof until such time as diplomatic and friendly relations existed between our own nation and Germany.
We do not find the public policy of our State and Nation as expressed in the organic law, statutes and judicial decisions, which are the proper sources of such policy, to be opposed, in letter or spirit, to the bequest of testator. Consequently, the bequest cannot be held void as against public policy.
III. But respondent contends that, although it may be ruled that the bequest is not void as being opposed to public policy, nevertheless the bequest must fail because the trustee or donee named to administer the testamentary gift never had any existence as a legal entity, either natural or artificial. It is insisted that the agreed statement of facts upon which thisAscertainable proceeding was tried and submitted shows thatDonee: there was no such organization as the "German RedPublic Cross Society of the Empire of Germany, in Europe"Charity. on February 24, 1920, the date of testator's death, or one year thereafter, and hence the gift fails for the want of a legal entity to take and administer the gift. It is furthermore urged by respondent that if "the then widows, orphans, and invalids, objects of charity under the then care and charge of said German Red Cross Society, aforesaid, resulting from the war now going on in Europe" are deemed to be the beneficiaries of the gift, then such beneficiaries are so indefinite and uncertain as a class that the testamentary gift must fail. Otherwise expressed, if we rightly understand respondent's contention, it is that there are no ascertained beneficiaries to take the bequest and, therefore, the legacy must fail.
Respondent, in support of his contention, relies mainly upon our rulings in Robinson v. Crutcher, 277 Mo. 1, and Cummings v. Dent, 189 S.W. 1161. In the Robinson case, a bequest was made to the "capital school fund" of certain school districts in this State, and a majority of this court, en banc, held that, inasmuch as the testator's will failed to designate a trustee or donee capable of taking legal title to the gift, the bequest, and the trust therein provided, must fail. In the Cummings case, a bequest was made to the Foreign Mission Board and the Home Mission Board of the Southern Baptist Convention and the State Board of Missions of the General Association (of the Southern Baptist Church) of the State of Missouri, and it was ruled that the "validity of these charities is determinable by the fact of the existence of such boards and their capacity to take such bequests at the time of the death of the testator." Their *Page 511 
non-existence was not shown by plaintiffs' proof and the cause was remanded in order that proof of the existence or non-existence of the boards named might be supplied. We think the aforecited cases are distinguishable from the instant case for the reasons hereinafter stated in this opinion.
That the testator herein, by item two of his will, intended to create a public charity, as that term has been judicially defined, cannot well be gainsaid. The term is thus clearly defined in 5 Ruling Case Law, 291: "Probably the most comprehensive and carefully drawn definition of a charity that has ever been formulated is that it is a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their hearts under the influence of education or religion, by relieving their bodiesfrom disease, suffering, or constraint, by assisting them toestablish themselves for life, or by erecting or maintaining public buildings or works or otherwise lessening the burdens of government." The foregoing definition is quoted with approval by this court in Robinson v. Crutcher, 277 Mo. l.c. 8, and Catron v. Scarritt Collegiate Institute, 264 Mo. l.c. 725. Continuing, the text-writer says, 5 Ruling Case Law, 323: "A charitable trust or a charity is a donation in trust for promoting the welfare of mankind at large, or of a community, or of some class forming a part of it, indefinite as to numbers and individuals. It may, but it need not, confer a gratuitous benefit upon the poor, or look to the care of the sick or the insane, or seek to spread religion or piety. . . . Charity in its legal sense comprises four principal divisions: trusts for the relief of poverty; trusts for the advancement of education; trusts for the advancement of religion; and trusts for other purposes beneficial to the community, not falling under any of the preceding heads." And, on pages 293, 294, of the same text, it is said: "A gift is a `public' charity when there is a benefit to be conferred on the public at large, or some portion thereof, or upon an indefinite class of persons. . . . The essential elements of a public charity are that it is not confined to privileged individuals, but is open to the indefinite public. It is this indefinite, unrestricted quality that gives it its public character. Without undertaking to be technically accurate, a `purely public' charity may be defined as one which discharges, in whole or in part, a duty which the commonwealth owes to its indigent and helpless citizens. . . . A charity may restrict its admissions to a class of humanity, and still be public; it may be for the blind, the mute, those suffering under special diseases, for the aged, for infants, for women, for men, for different callings or trades by which humanity earns its bread, and as long as the classification is determined by some distinction which involuntarily affects or may affect any of the whole *Page 512 
people, although only a small number may be directly benefited, it is public."
The bequest in the instant case clearly falling within the foregoing definitions of a public charity, it must be construed as valid, if possible, for "charitable trusts are the favorites of equity; they are construed as valid wherever possible, by applying the most liberal rules of which the nature of the case admits, and are often upheld where private trusts would fail. . . . Even if the donee, beneficiary, or trustee is, at the time of the gift, incapable of taking or not in existence, equity will uphold the gift, and, if necessary, appoint a trustee. Of two possible constructions, the court will adopt that one which operates to sustain the trust." [11 C.J. 307, 308.]
In 11 Corpus Juris, 331, the rule of construction is thus stated: "Where, from the context of the instrument of gift, or by parol evidence as to the surrounding circumstances, it can be made clear who is intended, a charitable gift is not invalid because the trustee or the donee is erroneously or uncertainly designated, but on the contrary the person or the institution identified as the one intended is entitled to take."
Thus, in Newell's Appeal, 24 Pa. 197, it was held that the "trustees of the Theological Seminary of the Presbyterian Church" at Princeton, New Jersey, could take under a devise "to the trustees or those who hold the funds of the Theological Seminary at Princeton, New Jersey," the corporation being generally known as the Theological Seminary at Princeton, and there being no other body answering the description in the will; in Woman's Union Missionary Society v. Mead, 131 Ill. 338, it was ruled that a bequest to the "fund for disabled ministers of the Presbyterian Church" will go to the "Presbyterian Board of Relief for Disabled Ministers and the Widows and Orphans of Deceased Ministers," it appearing that the latter is the only corporation engaged in relieving such ministers when disabled, that the testatrix knew and approved of said board, and that no such body existed as that named in the will; and, in the same case, it was further ruled that a legacy to the "Hahnemann Hospital at Chicago, Illinois" will go to the "Board of Trustees of the Hahnemann Medical College" for the benefit of its hospital, it appearing that the name "Hahnemann" was not applied to any other body in Chicago, and testatrix frequently visited the hospital; and also that a legacy to the "Chicago Training School for Nurses" will go to the "Illinois Training School for Nurses," it appearing that the latter is the only like institution in Chicago and that testatrix was interested in the latter school and had contributed to its support; in Straw v. Methodist Episcopal Church, 67 Me. 493, it was ruled that a bequest to the "Methodist Episcopal Missionary Society of Maine" may be received by the "Trustees of the East Maine Conference of *Page 513 
the Methodist Episcopal Church," where the former did not exist and the latter was incorporated to maintain the cause of missions in eastern Maine, where testatrix lived and died; in Woman's Foreign Missionary Society v. Mitchell, 93 Md. 199, a legacy to the "Board of Managers of the Foreign Missionary Society of the Methodist Episcopal Church," for the education of girls in India, was held to be intended to go to "The Woman's Foreign Missionary Society of the Methodist Episcopal Church," it being the only foreign missionary society in said denomination engaged in work of that character; and, in Gilmer v. Stone, 120 U.S. 586, a bequest made to the "Boards of Foreign and Home Missions" was held to be intended by testator to go to the "Boards of Foreign and Home Missions of the Presbyterian Church in the United States of America," although there were other denominations having boards of identical names, it appearing that testator was a member of the Presbyterian denomination.
In Schneider v. Kloepple, 270 Mo. 389, the testator devised certain real estate to the "St. Joseph Catholic Orphan Asylum in St. Louis, Missouri," and it was claimed by plaintiffs that there was no legal entity bearing such name and that the testamentary devise failed for that reason. In ruling the point, this court said, l.c. 397: "There was parol proof that for many years before William Brink made his will, and continuously since that time, there has existed in the city of St. Louis a voluntary charitable institution known as the St. Joseph Catholic Orphan Asylum. Its purpose was to provide a home for orphan boys of Catholic parentage. The churches in the diocese of St. Louis, including that in which the testator worshipped, contributed to the support of this asylum. Whether this was done directly or through the medium of the incorporated board of managers does not appear; but it was shown that the asylum was widely known among Catholics, and it is apparent from the testator's will that he knew of its existence and its character. It is true that the institution to which the devise was made was not a corporation, but a bequest of the character here under consideration will not be permitted to fail on that account. [The author of the opinion then discusses the effect of our rulings in Schmidt v. Hess, 60 Mo. 591; Missouri Historical Society v. Academy of Science, 94 Mo. 459; and Lilly v. Tobbein, 103 Mo. 477.] From these cases it will be seen that the corporate character of the devisee is not a prerequisite to the validity of a devise. While contending that the beneficiary named cannot take the residuary estate, it is also contended that the testator erroneously designated the devisee, intending the devise to be to the incorporated association. `The Managers of the Roman Catholic Orphan Asylums of St. Louis,' and hence no estate was created. If it be admitted that the devisee was erroneously named, this will not avoid the devise. Under the circumstances here *Page 514 
in evidence this general rule is applicable: where a beneficiary is designated by an erroneous name, the bequest will not be avoided if it is possible by means of the name, or by extrinsic evidence, to identify the beneficiary intended. [Citing authorities] . . . From all of which the conclusion is authorized that despite the fact a mistake may have been made by the testator in naming the beneficiary, the proof is sufficient to show that the corporation is entitled to take the devise."
While Jacob Rahn, the testator, may not have known the precise name or the exact legal status of the Red Cross organization in Germany, it is manifest to our minds that he knew to be existent an organization in Germany carrying on the usual and ordinary work and service of the Red Cross and that he intended his bequest to be administered by such organization, whatever might be its exact name or legal status. The purposes and service of the Red Cross organization are known the world over, wherever enlightened and civilized peoples dwell, and its unselfish service and beneficent purposes, whether in peace or in war, are extended to all the civilized nations of the world. It appears from the agreed statement of facts herein that, at the death of the testator, the Red Cross service in Germany was carried on by and through individual Red Cross Societies in the various states composing the German Empire, and that these separate state organizations, in matters of national concern, operated through a committee known as the Central Committee of the German Society of the Red Cross, for the following expressed purpose: "After the conclusion of peace, to grant aid to such needy participants in the war, who, in consequence of the war, were injured in their health and thereby impaired in their earning capacity (in other words, invalids), as well as their surviving dependents (i.e., widows and orphans), so far as they do not already receive sufficient assistance from the Empire or other sources." It is apparent to us that the testator was not concerned with the fact that there existed certain local or individual Red Cross Societies in the several states composing the German Empire, but that he intended his bequest to go to, and be administered by, the national organization of Red Cross in Germany, which, at the time of his death, appears to have been a committee known as the Central Committee of the German Society of the Red Cross, one of whose expressed purposes was the granting and rendering aid to needy widows, orphans and invalids, who might become objects of charity as a result of the late war, which class the testator in his will mentions and designates as the proper and intended beneficiaries to receive the ultimate relief, use and benefit of his bequest. It further appears from the agreed statement of facts that, since the death of testator and before his expressed will and intention could be carried out, the Central Committee aforesaid was succeeded by an incorporated body under the name of Das Deutsche Rote Kreuz (The *Page 515 
German Red Cross), which incorporated organization is in existence at this time. From the foregoing agreed facts, the intended trustee or donee of the testamentary gift is, we think, clearly identified, and the bequest should not be declared invalid or impossible of accomplishment merely because such trustee or donee may have been erroneously or inaccurately named or described by the testator. It is manifest to us that testator intended the bequest to be administered, on his death, by the national organization of Red Cross in Germany, which at that time was the Central Committee, and that organization having been since succeeded by the corporation, Das Deutsche Rote Kreuz (The German Red Cross), the latter corporation is the proper and intended trustee or donee to administer the bequest and the trust created thereby. The contention of respondent must therefore be ruled against him.
IV. Lastly, it is urged by respondent that the bequest plainly shows the intent of the testator to grant only immediate relief to a specific class of beneficiaries, under theLapse administration of a specific organization or trustee,of Time. and, because of lapse of time, the testator's intention has failed of accomplishment, and hence the bequest must be held to have failed. In other words, as we understand respondent's position, he contends that, inasmuch as the bequest provides that the amount thereof is to be "applied and paid out for the then immediate relief, use and benefit of the then
widows, orphans and invalids, objects of charity under the then
care and charge of said German Red Cross Society, resulting from the war now going on in Europe" at the expiration of one year after testator's death, or as soon thereafter as assets for such payment may be available, it is plain that testator desired his gift to be used at a particular time for a particular purpose, and none other, and the time designated for the payment of the bequest and the carrying out of testator's intent and purpose having expired, the testator's intent cannot now be carried out and fulfilled.
We cannot give assent to respondent's contention for several sufficient reasons. In the first place, the direction of the testator is that the bequest is "to be paid in the manner hereinafter stated," namely, by the executor of his will to the "then person acting in the accredited official capacity as Imperial German Consul, of Germany (or his accredited official successor in said official capacity) at St. Louis," the receipt of which consular officer is to be a full acquittance and discharge to the executor for the payment of all moneys under the will. According to the agreed statement of facts herein, there was no accredited consul of Germany at St. Louis to whom the executor could pay the bequest, or who could lawfully receive the same, until June 26, 1922, more than two years after testator's death. On May 4, *Page 516 
1922, the original petitioner, Hugo Mundt, Consul of Germany at St. Louis, presented and filed his petition for an order of distribution and payment of the bequest in the Probate Court of Carroll County, apparently some fifty-three days before he was duly accredited as the official German Consul at St. Louis, Missouri, by the United States Government. The matter or proceeding has been in litigation in the courts of this State continuously since the filing of said petition until the present time. Therefore, to uphold respondent's contention on this ground would mean to lend encouragement to a litigant, whose sole purpose and object in opposing payment and distribution of the testamentary bequest might be to defer final decision on the question of payment of the bequest until after the time designated in the will for effecting the payment. In upholding respondent's contention, the courts would aid in thwarting the intention of the testator; hence, to our minds, respondent's contention is irrational and preposterous. Furthermore, it cannot be seriously contended that the ultimate beneficiaries of the bequest, namely, the "widows, orphans, and invalids, objects of charity under the care and charge of the German Red Cross Society," resulting from the late war, are no longer in existence, and for that reason there is no trust to administer or beneficiaries to receive its benefits. It will be many years in the future before widows, orphans and invalids, as a class of humanity resulting from the late war, cease to be dependent upon charity or subsidy for support and maintenance.
It follows that the bequest or testamentary gift provided in the second item of testator's will is valid and should be paid and distributed in the manner stated therein. The judgment of the Circuit Court of Carroll County is accordingly reversed, and the cause is remanded with directions to said circuit court to enter a judgment directing the executor of the estate of Jacob Rahn, deceased, to pay the bequest of ten thousand dollars (less the inheritance tax levied and assessed thereon amounting to $528.38, heretofore paid by said executor to the State of Missouri) to the person acting in the accredited official capacity as Consul of Germany at St. Louis, Missouri (or the accredited official successor to said office), together with interest at six per cent per annum on said net sum from June 26, 1922 (the date when the original petitioner. Hugo Mundt, was recognized and accredited by the United States Government as the official Consul of Germany at St. Louis, Missouri) to the date of payment of said bequest.Lindsay, C., concurs.