**Ralph E. PAYNE and Wanetta Payne, Appellants,**

**v.**

**COUNTY OF JACKSON, Missouri, et al., Respondents.**

**No. 55738.**

Supreme Court of Missouri, Division No. 2.

Sept. 25, 1972.

Jack A. Cochran, and Julius M. Oswald, Blue Springs, for appellants.

Jim Tom Reid, County Counselor, Lee S. Shapiro, Asst. County Counselor, Kansas City, for respondent County of Jackson.

WILLIAM H. BILLINGS, Special Judge.

Plaintiffs sued Jackson County, Missouri, and the drivers of two automobiles for the wrongful death of their teenage son who was a passenger in one of the motor vehicles. The negligence charged against Jackson County was in failing to erect a stop sign at the intersection where the two vehicles collided, and, in failing to inspect for stop signs which had been removed or destroyed at the intersection.

Jackson County's motion to dismiss was sustained by the trial court because of governmental immunity. Following a premature appeal of this order, plaintiffs compromised their claims against the two individuals and dismissed them from the suit. Plaintiffs now prosecute this appeal urging wholesale abolition of the doctrine of sovereign immunity in this state. This we judicially decline to do and affirm the judgment of dismissal.

Plaintiffs first contend this doctrine is not the public policy of Missouri. We disagree. In In Re Rahn's Estate, Mo., 316 Mo. 492, 291 S.W. 120, this court stated (l.c. 124): ". . . it is not the function of the judiciary to create or announce a public policy of its own . . . as such policy is found to be expressed in the Constitution, statutes, and judicial decisions of the state . . . ."

The Missouri Constitution and statutes are silent on the matter of sovereign immunity but the judicial decisions of this court have declared in no uncertain terms that this doctrine is the public policy in this state. This court en banc in November, 1966, in Smith v. Consolidated School District No. 2, Mo., 408 S.W.2d 50, declared the doctrine of sovereign immunity was "one of fixed public policy" in Missouri. The court noted that the courts of Missouri had for more than a century held that political subdivisions of the state are not subject to liability in suits for negligence.

In Cullor v. Jackson Township Putnam County, Mo., 249 S.W.2d 393, the court observed some weakening of this doctrine in some jurisdictions but in reaffirming the rule in Missouri and denying recovery, said (l.c. 397): "But there has been no such change in public policy of this state in that regard, either through statutory enactment or constitutional revision. . . . ." Also see Glenn v. Department of Corrections, Mo., 434 S.W.2d 473 (1968).

Plaintiffs, in seeking review of the doctrine of sovereign immunity and its abolition by judicial fiat, cite cases from Arizona, Florida, Michigan, Illinois, Colorado, California, Minnesota, Wisconsin, Kansas, Nebraska, Indiana, Kentucky and Rhode Island in support of their contention we should judicially bury the doctrine. The identical California, Florida, Illinois, Michigan, Minnesota and Wisconsin cases were cited as authorities to this court by the plaintiffs in Fette v. City of St. Louis, Mo., 366 S.W.2d 446. In upholding the rule of sovereign immunity the court rejected these authorities and said (l.c. 447): "The view we have taken, stated in Brown

v. City of Craig, 350 Mo. 836, 168 S.W.2d 1080, 1084, and recently restated in Gillen v. City of St. Louis, Mo., 345 S.W.2d 69, 73, is as follows: 'This whole doctrine of governmental immunity has been increasingly criticised. *However, such nonliability is based not merely on the ancient view that the king can do no wrong, as frequently suggested; but also upon the principle that public officers have no authority to bind the sovereign (the whole people) except such as is given them by specific constitutional and statutory provisions.* The general rules of respondeat superior cannot be applied to them without opening up unlimited possibilities for wasteful and dishonest dissipation of public funds. While the complexity of modern government may require a relaxation of present rules of absolute nonliability, undoubtedly this is a matter for the Legislature (which must authorize the collection and disbursement of public funds) to provide in the interest of more complete justice to the individual but under strict regulations and with very definite limitations to protect the public interest.' See also Pearson v. Kansas City, 331 Mo. 885, 55 S.W.2d 485, and cases therein cited. (Our emphasis.)

"We think the above-cited recent Minnesota case, [Spanel v. Mounds View School Dist. No. 621, 264 Minn. 279, 118 N.W.2d 795] shows why this is properly a matter for the legislature. . . . The court stated the following suggested proposals that the legislature might adopt to meet the situation created by its abrogation of the doctrine (118 N.W.2d l.c. 804): '(1) A requirement for giving prompt notice of the claim after the occurrence of the tort, (2) a reduction in the usual period of limitations, (3) a monetary limit on the amount of liability, (4) the establishment of a special claims court or commission, or provision for trial by the court without a jury, and (5) the continuation of the defense of immunity as to some or all units of government for a limited or indefinite period of time.'

"If such legislation is required by the abrogation of this doctrine, and we think it is, it is our view that the whole matter should be left to the legislature. From the review of cases from other states in the opinion in the Minnesota case, we note that after the California decision, hereinabove cited: 'The California legislature promptly declared a moratorium on this and other claims similarly situated.' (118 N.W.2d l.c. 800). Likewise, it is stated that after the Illinois decision above cited: 'The Illinois Legislature responded promptly by reinstating tort immunity with respect to a number of subdivisions of government.' (118 N.W.2d l.c. 801.) All this confirms our view that whatever is done to change the doctrine of governmental immunity should be done by the legislature and not by the courts. (We have a precedent for legislative action in the Federal Tort Claims Act, U.S.C.A. Title 28, Chap. 171, Secs. 2671–2680, which has been followed in some states. See Annotation, 60 A.L.R.2d 1199.) It will be necessary to use public funds to settle claims or pay judgments and only the legislature can properly provide for their collection by taxation, authorize expenditures for liability insurance, create methods of payments similar to workmen's compensation or establish the other safeguards suggested in the opinion of the Minnesota Supreme Court. Our governmental units are all now operating financially on the basis of our long established precedents and our conclusion is that we should not abolish this doctrine by judicial fiat."

In Smith, 408 S.W.2d 50, l.c. 54, we declared, ". . . For more than a century the courts of Missouri have uniformly held generally that political subdivisions of the state are not subject to liability in suits for negligence. . . . Our holdings have been so uniform that nothing is to be gained by restating the reasons for and against the doctrine of sovereign immunity.

"We are aware that the theory of governmental immunity has been severely crit-

icized, largely by text writers and in law review articles. . . . It seems clear, however, that the principle of governmental immunity still prevails in the majority of states. . . . We regard the rule in Missouri as one of fixed public policy, and any abandonment of it, either as to political subdivisions or the state itself, should come through the legislative process. . . ."

We are not unaware that the doctrine of sovereign immunity continues to be under bitter assault and violent attack by some writers and law review commentators. We also recognize that in some jurisdictions the immunity doctrine has been abrogated in whole or part by courts or legislatures. In 18 jurisdictions which have judicially undertaken to weaken or abolish such immunity a quick retreat was thereafter taken by several of the courts and in seven of these jurisdictions the legislatures enacted comprehensive legislation. 56 Iowa Law Review 930–993 (1971).

Plaintiffs say the doctrine is "illogical and unjust doctrine, universally deplored . . . an aged survivor of Legal History, born in antiquity and kept viable only by stare decisis and inertia" and that the trend since our decision in *Cullor* has been for the courts to take the lead in restricting or wholly abolishing the doctrine. We believe that instant plaintiffs overlook the reasons for the doctrine that were again spelled out in *Cullor* and *Smith* by this court. Plaintiffs' contentions also fail to consider that in the jurisdictions referred to a careful state by state analysis is necessary to determine the extent of abrogation, including: the governmental entities affected; the nature and meaning of exceptions to liability, the impact of new law on prior statutes and decisions, the retroactive effect of new law; and, subsequent court decisions and legislative acts in such jurisdictions.

As we observed in the *Fette* and *Smith* cases, the abolition of the doctrine of sovereign immunity opens up a Pandor's box of complex and possible chaotic problems that we, in the exercise of judicial restraint, believe the legislature to be better equipped to solve than the judiciary.

Plaintiffs liken the doctrine of sovereign immunity to that of charitable immunity and since the latter doctrine was judicially abrogated by this court in Abernathy v. Sisters of St. Mary's, Mo., 446 S.W.2d 599, they suggest the reasons found therein apply equally as well to judicial abrogation of sovereign immunity. We do not so read Abernathy. The theories underlying charitable immunity were spelled out as the "implied waiver" and the "trust fund" theories and Abernathy found the "implied waiver" was mere fiction and the "trust fund" theory rested on an illogical and weak foundation. Abernathy recognized that at the time of adoption of charitable immunity it was ". . . a rule of expediency justifiable then, and for some time thereafter, to encourage and protect charity as vital to the growth and development of the state, but the reasons for the exception to the rule do not exist today." (l.c. 602–603.)

Conversely, wholesale abrogation of the sovereign immunity doctrine could very well deplete the governmental treasury to a point where proper performance of governmental duties would be impaired. Without certain limitations and exceptions, creation of special funds or liability insurance, an economic threat would remain, aside from the number of claims which could arise without any guidelines or procedure or limitations of liability. As Smith pointed out following the judicial abrogation in California, the number of tort claims against the state resulted in moratorium legislation. Following Perkins v. Indiana, 252 Ind. 549, 251 N.E.2d 30 (1969), which did not eliminate the doctrine entirely but authorized recovery against the state for negligence arising

from a *non-governmental function,* the Indiana Attorney General's Office reported (as of April 16, 1971): "Since the *Perkins* decision, approximately 85 cases have been filed against the State, and the rate is steadily increasing, the State cannot settle these claims; the State cannot hire local counsel to assist in their defense; the State has no procedural mechanism equipped to handle the heavy case load, and perhaps most significant, in the face of millions of dollars worth of suits pending and several large judgments, the state has no money appropriated with which to pay these judgments so that successful plaintiffs may not be able to get execution of their judgments in view of the restrictions in Art. IV, Sec. 24 of the constitution that 'no special act making compensation to any person claiming damages against the state shall ever be passed.'" 46 Indiana Law Journal 544–552. (1970–1971)

In 1968 in Parish v. Pitts, 244 Ark. 1239, 429 S.W.2d 45, the Arkansas Supreme Court abolished the rule of immunity insofar as it applied to torts caused by employees of municipalities while engaged in a governmental capacity (garbage collection). The dissenting Arkansas Justices aptly pointed out the pitfalls of judicial abrogation rather than legislative action and the Arkansas legislature in 1969 restored this immunity because of fears that "'units of government are in imminent danger of bankruptcy because of tort lawsuits, and vital public services are being discontinued.'" 56 Iowa Law Review 937, Note 36.

The doctrine of sovereign immunity is the law of this State and we judicially decline to alter or abolish this principle, deeming such to be the prerogative of the General Assembly.

Judgment affirmed.

All of the Judges concur.